ELSIE SORELLE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36218, 36411, 39789. Filed June 7, 1954.

---

---

[1] The following proceedings are consolidated herewith: Elsie SoRelle, Docket No. 36218; Estate of A. W. SoRelle, Deceased, A. W. SoRelle, Jr., Charles W. SoRelle, Irving SoRelle, and Jack SoRelle, Executors, Docket No. 36411; and Mabel Ruth SoRelle, Docket No. 39789.

*Benjamin L. Bird, Esq.*, *R. R. Wilson, Esq.*, and *Wentworth T. Durant, Esq.*, for the petitioners.

*Frank C. Allen, Esq.*, and *John W. Alexander, Esq.*, for the respondent.

**468**

OPINION.

(a) The basic rule is that taxable net income must be computed in accordance with the method of accounting which the taxpayer regularly employs in keeping his books, but if that method does not clearly reflect income the computation is to be made in accordance with such method as in the opinion of the Commissioner does clearly reflect income. I. R. C., sec. 41.[2] Two methods of accounting are generally recognized for income tax purposes—cash receipts and disbursements method and accrual method. It is well settled that hybrid methods of accounting which do not clearly reflect the taxpayer's income are improper. *Massachusetts Mut. Life Ins. Co.* v.

---

[2] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year. as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

*United States*, 288 U. S. 269; *United States* v. *Anderson*, 269 U. S. 422; *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281; *Estate of Julius I. Byrne*, 16 T. C. 1234; Regs. 111, sec. 29.41-2.[3] If, therefore, a taxpayer has used a hybrid method which does not clearly reflect income, adjustment must be made to make it conform to that method, cash or accrual, which it most closely resembles, *Niles Bement Pond Co.* v. *United States*, 281 U. S. 357, *Estate of Julius I. Byrne*, *supra*, and the Commissioner, in the exercise of his discretion under section 41, may not (as his contentions in this case indicate he is apparently attempting to do) compel the taxpayer to remain on such a hybrid basis. Farmers and livestock, raisers have the option of reporting their income on either a cash or accrual basis. Regs. 111, secs. 29.22 (a)–7, 29.22 (c)–6. If they use inventories, however, the accrual method of accounting is mandatory. Regs. 111, sec. 29.41–2.

We have found that SoRelle computed his income, for the tax years in question and for prior years back as far as 1939, on a hybrid basis which did not clearly reflect that income; he inventoried his cattle and, prior to 1946, all of his livestock and farm products, but recorded all other items on the cash basis. By electing to use inventories at least as far back as 1939 for sales of all of his livestock and farm products, SoRelle thereby made it mandatory for himself to use the accrual method until permission for change to another method was secured from the Commissioner. Regs. 111, secs. 29.22 (c)–6, 29.41–2. There is no evidence that such permission was ever secured either by SoRelle or his executors, who now argue that the cash basis of accounting for SoRelle's income for 1946 and 1947 is the proper one.[4]

We note that even though the only item inventoried in 1946 and 1947 was cattle, by far the major portion of SoRelle's business came from the sale of ordinary herd cattle, the receipts from which accounted for 64.55 per cent of his total operating receipts in 1946 and

[3] SEC. 29.41–2. BASES OF COMPUTATION AND CHANGES IN ACCOUNTING METHODS.—Approved standard methods of accounting will ordinarily be regarded as clearly reflecting income. A method of accounting will not, however, be regarded as clearly reflecting income unless all items of gross income and all deductions are treated with reasonable consistency. * * * All items of gross income shall be included in the gross income for the taxable year in which they are received by the taxpayer, and deductions taken accordingly, unless in order clearly to reflect income such amounts are to be properly accounted for as of a different period. But see sections 42 and 43. See also section 48. For instance, in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method.

[4] Under section 29.22 (a)–7 of the regulations, a farmer reporting income on the cash basis is required to ascertain his "profit from the sale of livestock * * * purchased after February 28, 1913, * * * by deducting the cost from the sales price in the year in which the sale occurs * * *." As indicated in our findings, however, SoRell's book entries of cattle purchases and sales made during the tax years often do not disclose the type of cattle involved and, in some cases, do not even indicate the number involved. In any case, therefore, it would seem that cattle costs could not now properly be matched up with sales prices by the petitioners so as to determine SoRell's income on the cash basis as prescribed in the regulations.

86.67 per cent of total operating receipts in 1947. Moreover, although SoRelle did not accrue his sales receipts or his expenses, it was found that he usually received the proceeds of a cattle sale on the day of the sale and that he always paid his expenses promptly. Examination of the record also indicates that a good portion of the remaining receipts for 1946 and 1947 can be identified as originating in cash transactions. Therefore, even as regards 1946 and 1947, petitioners have failed to show at least that in the majority of the most substantial items of income and deductions SoRelle's accounting method is not an accrual method. In *Diamond A Cattle Co.*, 21 T. C. 1, we said:

This is not a case in which the Commissioner has attempted to change a long established and consistently used method of accounting on the ground that it does not clearly reflect income or on any other ground. Instead he has merely insisted, as the law and regulations require, that the petitioner consistently follow the method of its choice, i. e., an accrual method, with respect to several substantial items which would have to be accrued under any proper accrual method. * * *

In other words, even though SoRelle's book entries, other than the aforementioned inventories from 1939 through 1947, were made on a cash basis his method of doing business was such that the income which those books indicate was realized from his major business activity, buying and selling cattle, is, with one important exception, substantially that which the books would show for that activity had they been kept entirely on an accrual basis. That one exception involves cattle sales totaling $28,732.83 which we have found were made at the end of December 1945, but were entered in SoRelle's books as income for January 1946. Those sales must be excluded in computing SoRelle's 1946 income; on the accrual basis they are properly a part of his 1945 income. *David W. Hughes*, 22 T. C. 1.

It is, of course, true that there are other less important items which would be recorded differently in SoRelle's books had he used a strict accrual basis and for which, because of lack of information, we cannot make appropriate adjustment. For example, there is not sufficient information upon which to reconstruct inventories of those less important products which SoRelle sold in the years in issue. Although this produces some distortion in the determination of income, it is the result of SoRelle's own failure to take inventories in a proper manner and to maintain proper records. Petitioners therefore, cannot be heard to complain. Moreover, we are of the opinion that those items have no substantial effect on the end result. *Diamond A Cattle Co.*, *supra.*

(b) Petitioners contend that, even though the accrual method of accounting be held the proper one for SoRelle, the Commissioner erred in valuing SoRelle's inventories of cattle and wheat for 1946 and

1947 pursuant to the so-called farm-price method rather than at cost. The farm-price method provides for the valuation of inventories at market price less direct cost of disposition. Regs. 111, sec. 29.22 (c)–6. No change in the method of valuing inventories can be made without first securing the Commissioner's approval. Regs. 111, sec. 29.41–2. Petitioners have failed to convince us that the Commissioner erred in valuing SoRelle's inventories (other than those of his breeding herd and milk cows) pursuant to the farm-price method. It was SoRelle's duty to keep accurate and complete inventory records, Regs. 111, sec. 29.22 (c)–2, and by failing to do so he has prevented petitioners from successfully carrying their burden of proof. That SoRelle is now dead and it consequently may be impossible to sustain that burden is unfortunate but does not alter the situation. *Burnet* v. *Houston*, 283 U. S. 223.

We have found, as aforementioned, that SoRelle's practice was to value all his inventories, other than those of his breeding herd and milk cows, pursuant to the farm-price method. The latter he appears to have valued on the basis of average purchase cost, unadjusted for feeding and maintenance costs which were deducted annually. Since the record contains no evidence that either SoRelle or his executors ever obtained permission from the Commissioner to change the inventory valuation method, it is manifest that all of SoRelle's inventories for 1946 and 1947 must be valued pursuant to the farm-price method. This mandate extends to the breeding herd and milk cow inventories, which are required to be valued pursuant to the farm-price method by section 29.22 (c)–6 of the regulations, providing that: "If this [farm-price] method of valuing inventories is used, it must be applied to the entire inventory except as to livestock inventoried, at the taxpayer's election, under the 'unit-livestock-price method'." Petitioners do not make any contention that SoRelle used the "unit-livestock-price method." Our findings contain the proper computation of SoRelle's inventories pursuant to the farm-price method for all the critical dates involved in this case.

(c) We have found that 17,000 bushels of wheat were in SoRelle's bins as of January 1, 1946, and were owned in equal shares by SoRelle and his divorced first wife, Laura. This wheat was not sold until sometime after SoRelle married Elsie on May 25, 1946. The value of SoRelle's share of the wheat, calculated pursuant to the farm-price method, was $12,665 on January 1, 1946, and $14,110 on May 25, 1946. It must be included, at those respective values, in SoRelle's January 1, 1946, inventory and Elsie's May 25, 1946, inventory for the purpose of computing her share of the community income.

It is true that the wheat was SoRelle's separate property and did not belong to the community of SoRelle and Elsie. However, the

proceeds realized from sale of the wheat (subsequent to SoRelle's and Elsie's marriage) were commingled with proceeds realized from the sale of their community property and were included in determining Elsie's income. It is not possible to segregate those proceeds now, since there is no evidence indicating the amount thereof. Therefore, under the law of Texas, the proceeds are gross income of the community. *W. D. Johnson*, 1 T. C. 1041, 1056. As such they are taxable in equal shares to SoRelle and Elsie. *Poe* v. *Seaborn*, 282 U. S. 101. It naturally follows that the wheat is properly includible in Elsie's opening inventory as of May 25, 1946, which is to be used for the purpose of computing her share of the community income from May 25, 1946, to the end of the year.

## II. *Breeding Herd.*

### ISSUES.

(a) Whether the Commissioner failed to properly give capital gains treatment, under section 117 (j) of the Code, to income derived from the sale of livestock from SoRelle's breeding herd.

(b) Whether depreciation deductions, under section 23 (l), may be taken on the breeding herd.

### FINDINGS OF FACT.

SoRelle's breeding herd was kept on his ranch 42 miles away from the farm on which the ordinary herd was pastured. None of the breeding herd cows were registered and, although there was testimony to the effect that SoRelle might buy either registered or unregistered bulls, there is no evidence indicating that any of the bulls in inventory during 1946 and 1947 were registered. When any cows outlived their usefulness as breeders, either because of poor health or of reaching an age usually in excess of 7 years, they were sold for beef. Similarly the bulls were sold for beef when they outlived their usefulness as breeders. When necessary SoRelle would replenish his herd of bulls through purchases and his herd of cows both through purchases and selection of promising heifers from his ordinary herd. He included his cows and bulls in inventory at average purchase cost, but deducted as current expenses the costs of food and maintenance for the herd. SoRelle did not buy cows or bulls, nor utilize heifers raised by him and once transferred to the breeding herd, for any purpose other than as breeders; he did not buy or raise such cows or bulls for beef purposes.

In the tax years in issue SoRelle sold the following breeding herd stock, which stock was held by him for at least 6 months prior to the dates of sale and had the bases noted:

| Date | Stock | Net price | Basis per head for sale |
|------|-------|-----------|-------------------------|
| *1946* | *Cows* | | |
| July 22 | 32 | $4,283.21 | $80 |
| *1947* | | | |
| September 17 | 70 | 11,091.43 | 88 |
| September 24 | 46 | 7,710.69 | 88 |
| October 15 | 51 | 5,151.09 | 88 |
| October 22 | 11 | 1,498.57 | 88 |
| November 29 | 202 | 32,665.82 | 88 |
| Total for 1947 | 380 | $58,117.60 | |

SoRelle never claimed any deductions for depreciation of his breeding herd in his returns for 1939 through 1945, nor in his original returns for 1946 and 1947. Neither did his executors claim such deductions in the amended returns filed for 1946 and 1947. At the hearing petitioners contended that deductions for breeding herd depreciation should be allowed in the amounts of $4,633.92 for 1946 and $5,740.40 for 1947.

OPINION.

(a) In his brief the Commissioner concedes, as petitioners contend, that, despite the fact that SoRelle inventoried his breeding herd, he is entitled to capital gain treatment on sales of the stock culled from that herd if such stock was held by him for more than 6 months. I. R. C., sec. 117 (j) ; [5] *Albright* v. *United States*, (C. A. 8) 173 F. 2d 339; Mim. 6660, 1951–2 C. B. 60. It is clear from the language of the statute, the Commissioner's regulations and rulings, and the appli-

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business," means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

Section 324 of the Revenue Act of 1951 provides that the sentence dealing with livestock in section 117 (j) (1) "shall be applicable with respect to taxable years beginning after December 31, 1941, except that the extension of the holding period from 6 to 12 months shall be applicable only with respect to taxable years beginning after December 31, 1950."

cable case law that this result follows even though the taxpayer elects to include the breeding stock in his inventory and forego deprecia tion thereon, rather than to capitalize such stock and take depreciation deductions. Regs. 111, secs. 29.117–7 (a)–1, 3, 29.117–7 (c) ; I. T. 3666, 1944 C. B. 270 ; *Fawn Lake Ranch Co.*, 12 T. C. 1139.

The only questions remaining, therefore, are factual ones involving the numbers of breeding herd cattle sold which qualify for section 117 (j) treatment, the amounts received therefor, and the proper bases for sale. Our findings in this respect reveal that, in 1946, SoRelle sold 32 breeding herd cows for a total of $4,283.21 and that his basis therefor (i. e., their value in the last inventory prior to sale), I. R. C., sec. 113 (a) (2), was $2,560 ($80 each). During 1947, SoRelle sold 380 breeding herd cows for a total of $58,117.60, and their basis under section 113 (a) (2) was $33,440 ($88 each).

(b) In Regulations 111, section 29.22 (a)–7, farmers reporting income on the accrual basis are given the option of either treating their breeding stock as "capital assets subject to depreciation" or including such stock in inventory. If the latter course is adopted, however, the taking of depreciation deductions on the breeding stock is expressly prohibited by section 29.23 (1)–10 of the regulations, which provides as follows:

A reasonable allowance for depreciation may also be claimed on live stock acquired for work, breeding, or dairy purposes, unless they are included in an inventory used to determine profits in accordance with section 29.22 (a)–7. Such depreciation should be based on the cost or other basis and the estimated life of the live stock. If such live stock be included in an inventory no depreciation thereof will be allowed, as the corresponding reduction in their value will be reflected in the inventory. * * *

We think that the denial of depreciation deductions for inventoried breeding stock accords with sound accounting practices for the precise reason stated in section 29.23 (1)–10, to wit, "the corresponding reduction in their value will be reflected in the inventory." Moreover the aforementioned regulatory provisions have been contained in the regulations since 1934,[6] and the statutory provisions which they interpret have been repeatedly reenacted, without changes here pertinent, since then.[7] Consequently, this long continued executive construction must be deemed to have received legislative sanction. *Oil Shares, Inc.*, 29 B. T. A. 664.

In view of the regulations petitioners must fail in their claim that depreciation deductions on SoRelle's breeding herd for 1946 and 1947

---

[6] Sec. 29.22 (a)–7 appeared as Art. 22 (a)–7 of Regulations 86 (1934), 94 (1936), and 101 (1938), and as Sec. 19.22 (a)–7 of Regulations 103 (1939). Sec. 29.23 (1)–10 appeared as Art. 23 (1)–10 of Regulations 86 (1934), 94 (1936), and 101 (1938), and as Sec. 19.23 (1)–10 of Regulations 103 (1939).

[7] See sections 22 (a) and 23 (1) of the Revenue Acts of 1934, 1936, 1938, and of the Code.

are allowable. Since at least as far back as 1939 SoRelle, whose proper accounting method we have heretofore determined to be the accrual method, had been inventorying his livestock and including his breeding herd in that inventory. He had never in any of his tax returns claimed depreciation deductions for his breeding herd. Obviously, therefore, he had elected not to capitalize the breeding herd and take depreciation deductions thereon but, rather, to include it in inventory and forego depreciation deductions. By including the breeding herd in SoRelle's inventories for 1946 and 1947, we have accorded with this election by SoRelle.

### III. *Gifts of Wheat.*

#### ISSUES.

(a) Whether gifts of land and the matured crops of wheat thereon, which SoRelle made to his children on June 23, 1947, immediately prior to harvest, resulted in the realization of taxable income equal to the fair market value of the wheat at the date of the gift.

(b) If taxable income was realized, whether it was the separate income of SoRelle or community income of him and his then wife, Elsie.

#### FINDINGS OF FACT.

SoRelle had four children: Arthur W. SoRelle, Jr., Charles W. SoRelle, Emily SoRelle Upshaw, and Florence SoRelle Bohannon. In May 1946, before his marriage to Elsie on the 25th thereof, SoRelle first discussed with his accountant gifts of land which he contemplated making to each of his four children. By the fall of the year he had decided upon the parcel of land which each child would be given and inquired of his accountant whether the conveyance of the land would carry with it the transfer of any wheat growing thereon. The accountant replied that it would. In December 1946, SoRelle told Florence SoRelle Bohannon that he was going to give her a certain identified parcel of land, which he had that fall seeded in wheat and that the wheat crop would also be hers. He further said that he would harvest the wheat for her, store it, let her know when it was wise to sell, sell it for her, and turn over the proceeds to her, less his harvesting and sales expenses. SoRelle also told his other children about the specific parcels of land he intended to give them along with the wheat crops thereon.

Time passed but SoRelle failed to make the intended gifts. His accountant therefore warned him that unless he completed the gifts prior to the harvesting of the wheat he would be subject to income tax on the crop. Consequently, on June 23, 1947, just prior to the harvesting (which terminated on July 4 or 5 of that year) SoRelle

executed four warranty deeds conveying the four parcels of land, upon which there were matured wheat crops, to his four children. The fair market value of the matured wheat crops at the date of the gifts totaled $53,259.50  The land conveyed was SoRelle's separate property, not the community property of him and his then wife, Elsie.  Elsie had no control over the giving or withholding of the land itself, she did not sign the deeds, nor did she in any way join in or oppose the gift of the land or of the wheat thereon.  There were no restrictions or conditions placed by SoRelle upon the children's ownership of the land, the wheat, or the proceeds to be received from the sale of the wheat, but it was understood that the children would lend SoRelle the proceeds of sale.

A. W. SoRelle, Jr., supervised the harvesting of the wheat on his gift parcel of land and Florence SoRelle Bohannon's husband supervised the harvesting of the wheat on her land.  It appears that the harvesting of the crops on the other two parcels was supervised generally by SoRelle.  SoRelle's employees and equipment were used in all the aforementioned harvesting.  At the time the gifts were made, no contract or arrangement for the wheat's sale had been made and no immediate sale was contemplated.  The wheat was placed in SoRelle's storage bins, was held without charge to the children until SoRelle deemed it advantageous to sell, and was then sold with the children's consent sometime subsequent to the end of 1947.  The proceeds of the sale (less an amount retained by SoRelle as reimbursement for harvesting and selling expenses) were subsequently loaned to SoRelle by his children.  The children received notes evidencing the loans, which were paid in full by SoRelle's executors following his death on January 10, 1949.

SoRelle filed a gift tax return for 1947, covering the aforementioned four gifts of land and wheat, and the four donees paid income tax on the profit realized from the subsequent sale of the wheat.  The cost of planting, raising, and harvesting the wheat was deducted from the income reported on SoRelle's 1946 and 1947 original and amended returns.

OPINION.

(a)  The Commissioner, in Docket No. 36411, contends that SoRelle realized, and is taxable on, income in 1947 equal to the fair market value of the wheat at the date of the gifts.  Alternatively, by amended answer in Docket No. 36218, the Commissioner contends that income realized from the gifts is community income, half of which is taxable to Elsie.

There is no doubt in our mind as to the bona fides of SoRelle's gifts of land and wheat crops to his four children.  A genuine intent to make the gifts was first manifested by SoRelle in May 1946, over a

year before the gifts were actually consummated, and no "strings" were attached to the gifts or to the proceeds derived from the contemplated sales of the wheat. Although there was an understanding that the proceeds of sale would be loaned to SoRelle by the donees, the gifts were not conditioned thereon and no compulsion in that respect was exercised. Such loans were conducted on a business basis, evidenced by notes which were subsequently paid. In other words, the gifts were not mere shams and the Commissioner, in fact, has not urged that point. See *Richardson* v. *Smith*, (C. A. 2) 102 F. 2d 697.

Moreover, it has not been contended, nor does it appear, that SoRelle retained such control over the wheat as to be regarded as its owner for purposes of income taxation. See *Helvering* v. *Clifford*, 309 U. S. 331. His supervision of the harvesting of some of the wheat, the storage of it all in his bins, and the arrangement whereby he was to determine the time for its sale were simply managerial functions performed with the donees' consent. They were such as any father might well be expected to perform for his children.

Respondent argues, however, that under *Helvering* v. *Horst*, 311 U. S. 112, SoRelle "realized" taxable income equal to the fair market value of the wheat at the date of the gifts. In that case, the Supreme Court held that the owner of bonds who continued to retain ownership of the bonds but made a gift to his son of negotiable interest coupons thereon, which matured and were cashed by the son later in the taxable year, realized income in the amount of such interest coupons.

Petitioners contend that *Helvering* v. *Horst, supra,* is not controlling here and that the courts have consistently declined to extend the principle of the *Horst* case to a gift of the property itself as distinguished from an assignment of the income. Petitioners rely on the following facts as sufficient to show that the *Horst* case is not applicable in the instant case: (1) The gifts in question were actually completed gifts, designed to vest in SoRelle's children the entire ownership of the lands in question, with no character of interest or control reserved by SoRelle in either the land itself or the crop growing on the land at the time of the gifts; (2) they were an actuality, that is to say, they were not devices designed to anticipate income or simply to reallocate it within the family without change of control, but were instead unqualified conveyances of real estate; and (3) they represented merely the completion of that which SoRelle had fully determined to do a good many months back and were not prompted by the existence of a crop on the land. We think that petitioners must be sustained in their contention that the *Horst* case is not controlling here.

*Pearce* v. *Commissioner*, 315 U. S. 543, dealt with an annuity contract purchased by the divorced husband for the divorced wife pursuant to their agreement made prior to the divorce, the question being whether the income produced by the annuity subsequent to the divorce decree was taxable to the wife, who received it, or to the husband, who provided it. In holding the income taxable to the wife and not to the husband, the Court said:

Such cases as Helvering v. Horst, 311 U. S. 112, 61 S. Ct. 144, 85 L. Ed. 75, 131 A. L. R. 655, Helvering v. Eubank, 311 U. S. 122, 61 S. Ct. 149, 85 L. Ed. 81, and Harrison v. Schaffner, supra, are not opposed to this result. Those cases dealt with situations where the taxpayer had made assignments of income from property. He was held taxable on the income assigned by reason of the principle "that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach" of the federal income tax law. Harrison v. Schaffner, supra, 312 U. S. page 580, 61 S. Ct. page 760, 85 L. Ed. 1055. But in those cases the donor or grantor had "parted with no substantial interest in property other than the specified payments of income." Id., 312 U. S. page 583, 61 S. Ct. page 762, 85 L. Ed. 1055. *Here he has parted with the corpus. And "the tax is upon income as to which, in the general application of the revenue acts, the tax liability attaches to ownership."* Blair v. Commissioner, 300 U. S. 5, 12, 57 S. Ct. 330, 333, 81 L. Ed. 456. * * * [Emphasis supplied.]

It is the settled law of Texas that the conveyance of the land carries with it the ownership of the growing crops, so that when the crops were harvested they actually belonged to the SoRelle children because they actually owned the land. 13 Tex. Jur. p. 19; *Roberts* v. *Armstrong*, (Tex. Com. App.) 231 S. W. 371; *Hollomand* v. *Bishop*, (Tex. Civ. App.) 197 S. W. 1000; *Ray* v. *Foutch*, (Tex. Civ. App.) 50 S. W. 2d 380; *Dimmitt Elevator Co.* v. *Carter*, (Tex. Civ. App.) 70 S. W. 2d 615.

We are not here concerned with a mere assignment of the right to receive income. We do not here have an "anticipatory arrangement devised to prevent income from vesting in the donor." We are not here concerned with a mere reallocation of business income within the family group. We have instead an actually completed and admittedly bona fide gift of income producing property, and the gift of that property carried with it the unharvested wheat crop which was still on the land. This wheat became the property of the four children to whom the land was given and when the wheat was harvested and later sold the income resulting therefrom belonged to the children and was taxable to them and not to petitioner. See *Estate of W. G. Farrier*, 15 T. C. 277. This case involved a gift by Mamie F. Farrier, widow of decedent, to her daughter of a herd of cattle consisting of old cows, which decedent had owned at the time of his death, and 80 head of heifers and calves which had been raised by the estate.

Respondent sought to tax to Mamie F. Farrier, as income, the value of the heifers and calves which he alleged was realized by reason of the gift under the doctrine of *Helvering* v. *Horst, supra.* We held, in favor of the taxpayer, that the *Horst* case was not applicable and that there was no income realized by Mamie F. Farrier by reason of the gift.

As to this issue, we sustain petitioners.

(b) In view of our above decision it is unnecessary to discuss the second issue posed at the beginning of this part of our Opinion.

## IV. *Elsie SoRelle.*

### ISSUES.

(a) Whether Elsie SoRelle, who reported her income on the cash basis prior to her marriage to A. W. SoRelle on May 25, 1946, may properly be required to report her share of the community income from SoRelle's business on the accrual basis used by SoRelle.

(b) Whether $58.60 was erroneously allowed by the Commissioner as a credit against tax in computing Elsie SoRelle's deficiency for 1946 and should, therefore, be added to that deficiency.

### FINDINGS OF FACT.

Elsie married SoRelle on May 25, 1946. Prior to that she earned her income as a school teacher and stenographer and always reported it for tax purposes on the cash receipts and disbursements basis, maintaining no books or records. From January 1 to May 25, 1946, Elsie earned $735 in wages teaching at the Hartley Independent School, Hartley, Texas. From these earnings $89.60 in income taxes was withheld. On January 15, 1947, she filed a separate return, under her maiden name of Elsie M. Wheeler, covering those earnings. In an amended answer the Commissioner states that, in computing Elsie's deficiency for 1946, he gave her full credit against tax for the $89.60 withheld from her wages but that, in fact, $58.60 of that sum had previously been refunded to her. Respondent, therefore, claims that the deficiency for 1946 determined against Elsie in the statutory notice should be increased by $58.60 and the negligence penalty by $2.93. There is no evidence in the record that any taxes withheld from Elsie's wages in 1946 were, as claimed by respondent, ever refunded to her.

Elsie filed returns covering her share of the income earned by the community of herself and SoRelle from May 25 to December 31, 1946, and for 1947. These were separate returns filed under the name of Mrs. A. W. SoRelle on March 15, 1947, and March 4, 1948, respectively. The 1946 return was prepared by SoRelle's bookkeeper, and the 1947 return by his accountant. On May 13, 1949, subsequent to SoRelle's

death, Elsie filed amended returns prepared by the accountant covering her community income for 1946 and 1947.

Elsie did not acquire any of SoRelle's separate property subsequent to her marriage to him. She did not enter into any sort of business arrangement or partnership with him, did not participate in the business, and his books contained no income or disbursement accounts pertaining to her. She neither kept books of her own after the marriage nor maintained any record of the earnings of the community, and there is no evidence of those earnings other than the books and records of SoRelle himself. Elsie had no accounting or bookkeeping experience and she was not familiar with SoRelle's books, which were kept during 1946 and 1947 by his bookkeepers. She went to the bookkeepers' and to the accountant's offices to sign the original and amended tax returns prepared by them for 1946 and 1947, but never discussed those returns with them and did not know the reason for filing the amended returns. Elsie never requested permission from the Commissioner to change her method of reporting income from the cash to the accrual basis nor did she follow the adjustment procedure or file the adjustment sheets prescribed in Treasury Regulations 111, section 29.22 (c)–6, as a step in changing such basis.

The computation, on the accrual basis from SoRelle's books, of Elsie's community share of the income from SoRelle's business is a computation which clearly reflects her income therefrom.

In her original and amended returns for the period May 25–December 31, 1946, and for 1947, Elsie reported the following as her net income and tax thereon:

| Year | Item | Original return | Amended return |
|---|---|---|---|
| 1946 | { Net income | $17, 635. 45 | $23, 363. 28 |
| | { Tax | 5, 479. 34 | 8, 444. 86 |
| 1947 | { Net income | 14, 274. 16 | 24, 998. 92 |
| | { Tax | 3, 983. 25 | 9, 142. 02 |

Elsie made the following payments on her 1946 tax:

| Date | Amount |
|---|---|
| Jan. 14, 1947 | $4, 000. 00 |
| Mar. 15, 1947 | 1, 479. 34 |
| July 26, 1949 | 1, 486. 18 |
| Total | $6, 965. 52 |

On July 26, 1951, Elsie filed a claim for a $6,463.52 refund of the 1946 taxes paid by her, which claim was reasserted in the petition filed by her in this case. In her brief she now argues that her net income for 1946, computed on the cash basis, is $7,349.74, and that a refund of $5,574.86 is therefore due. Her brief further asserts that

her net income for 1947, computed on the cash basis, is $47,275.74, and concedes that consequently a deficiency of $12,190.89 for that year is owed.

OPINION.

(a) Petitioner Elsie SoRelle contends that she reported her income on the cash basis prior to her marriage to SoRelle, that the marriage did not make her a new taxpaying personality, that she therefore remained under the duty to report her community share of the income from SoRelle's business for 1946 and 1947 on the cash basis, and that the Commissioner may not require her to use the accrual basis. In support of this position, Elsie relies primarily on *Irene Nunnery Theriot*, 15 T. C. 912, affd. (C. A. 5) 197 F. 2d 13, certiorari denied 344 U. S. 874. In the *Theriot* case, the taxpayer and her husband were domiciled in Louisiana, a community property State. Prior to her marriage, the taxpayer reported her income on the calendar year basis, using the cash receipts and disbursements accounting method. She kept no books or records either before or after her marriage. Her husband kept books for his business, an individual proprietorship, and he reported his income on a fiscal year basis using the accrual method of accounting. The issue was whether the taxpayer could report her share of the community income on a fiscal year basis. This Court held, with the Court of Appeals for the Fifth Circuit affirming, that the taxpayer could not report her community income on the fiscal year basis because (1) section 41 of the Code makes it mandatory for income to be computed on the calendar year basis when the taxpayer does not keep books and the books of her husband's business were not her books as an individual, and (2) taxpayer failed to comply with section 46 of the Code and Regulations 111, section 29.46–1, which require the Commissioner's approval for a change from the calendar year to fiscal year basis. It was further held that the taxpayer did not, by her marriage, become a new taxpaying personality and was therefore bound by her prior returns on the calendar year basis.

There are obvious distinctions between *Theriot, supra*, and the instant case. However, we need not discuss those distinctions nor determine their validity since the Fifth Circuit's opinion directly dealt with the question at hand. Although the taxpayer had, prior to her marriage, reported her income on the cash basis, her community income was reported on the accrual basis, having been computed from her husband's business books which were kept on that basis. She did not first secure the Commissioner's approval to change her accounting method from cash to accrual, as required by section 29.41–2 of the regulations. Nevertheless, the court stated at 197 F. 2d 15:

There is no fatal inconsistency in the Tax Court's decision in holding that the taxpayer's income could not be reported on the basis of the community fiscal

year, and yet sustaining the computation of her income from the business books kept on the accrual basis, even though the taxpayer had formerly reported her income on the cash basis. To attempt to state her income otherwise than according to her husband's books would lead to a chaotic situation. In sustaining the computation therefrom, the Tax Court did not treat the books of the husband as the wife's books, but rather, we think, sustained the Commissioner in the exercise of the discretion vested in him by Section 41 of the Internal Revenue Code, 26 U. S. C. A. § 41, to approve a method which would clearly reflect the income of the taxpayer.

In view of our finding that the computation of Elsie's community income on the accrual basis from SoRelle's books clearly reflects income, we are of the opinion that the above quoted excerpt is dispositive of this issue.

(b) In an amended answer the Commissioner contends that he erroneously gave Elsie credit for $58.60 in computing her deficiency for 1946. He therefore prays that Elsie's 1946 deficiency be increased by that amount and that her 1946 negligence penalty be increased by $2.93 (5 per cent of the additional deficiency). The facts relative to this claim are stated in our Findings. In brief the claim rests upon the allegation that the Commissioner, in determining Elsie's deficiency for 1946, gave her a credit against tax for $89.60 withheld from wages she earned in that year prior to marrying SoRelle when, in fact, $58.60 of that sum had been refunded to her. The burden of proving this claim rests upon the Commissioner. Tax Court's Rules of Practice, Rule 32. Since there is no evidence in the record that the $58.60 was ever refunded to Elsie, the Commissioner has not carried that burden and must, therefore, fail in his contention.

### V. *Mabel Ruth SoRelle.*

#### ISSUE.

Whether income earned by A. W. SoRelle's business between January 1, 1946, and March 25, 1946, was community income taxable in equal proportions to SoRelle and his then wife, Mabel Ruth SoRelle, or was SoRelle's separate income. If it was community income, whether the Commissioner has successfully carried his burden of proving that the 5-year statute of limitations prescribed in section 275 (c) of the Code is applicable to Mabel Ruth SoRelle.

#### FINDINGS OF FACT.

SoRelle married Mabel on February 12, 1945. On January 24, 1946, Mabel and SoRelle intended to and did separate permanently. They entered into a separation agreement in contemplation of divorce on February 19, 1946 (acknowledged February 20, 1946), disposing of their separate and community property as of that date. The agreement was subsequently incorporated into their divorce decree handed

down on March 25, 1946, by the District Court, Potter County, Texas, 108th Judicial District. In pertinent part the agreement states:

**2.**

Whereas disputes and unhappy differences have arisen between the parties hereto, for which reason they have consented and agreed to live separate and apart from each other during their natural lives, and they contemplate securing a divorce, they having separated from each other on January 24, 1946 and have not lived together as man and wife since said date, and hereby wish to fully and completely settle all property rights as between them.

**3.**

The parties hereto own certain real and personal property as will be hereinafter set forth; that first party [SoRelle] owned as his separate estate at the time of his marriage to second party [Mabel] the following described real estate, to-wit:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

that in addition to said real property first party owned considerable personal property in the nature of cattle, horses, farm equipment and machinery, automobiles, trucks and pickups at the time of his marriage to second party. Second party owned certain personal property, the exact nature and extent of which she cannot determine at this time. There having been certain community property acquired by said parties since their marriage in the nature of rents and revenues from the operation of first party's estate, and the enhancement and value of said first party's estate.

**4.**

The parties hereto have given due consideration to the differences arising between them and have come to the mutual conclusion that their further living together as man and wife has become insupportable, and the parties hereto have further given due consideration of all the property rights and interest by them owned, and are each entirely familiar with all the various kinds and character of property so owned and the respective values thereof. Said parties have agreed to fully settle and compromise, adjust and partition all property, real, personal and mixed owned by them at this time to the end that each shall henceforth own in his or her separate name, and as his or her separate property and estate the entire interests in portion of said property, and so that there shall be no jointly owned properties or property rights existing between them.

**5.**

In consideration of the premises and of the desire of the parties to partition and divide all properties owned by them, and fully settle and adjust all community property and property rights as between the parties, the parties hereto have mutually agreed to so partition, divide and settle such properties as follows:

A. From and after the date hereof, the said A. W. SoRelle shall take, have, hold and own as his sole and separate property and estate, free and clear of any interest therein or lien, claim or demand of any nature whatsoever on the part of the said Mabel Ruth SoRelle all of the following described property, and the said Mabel Ruth SoRelle does, by the execution of this instrument, hereby sell, assign, transfer and convey to the said A. W. SoRelle all of her

right, title and interest in and to said following described property, for which she hereby binds herself, her heirs, executors, administrators and assigns to the said A. W. SoRelle, his heirs, executors, administrators and assigns forever, to-wit:

(1) [Certain described real estate.]

(2) All cattle of every description now owned by said parties; all horses, hogs, sheep, and all livestock of every description now owned by said parties.

(3) All automobiles, trucks, trailers, pickups, and all farm machinery of every kind or character now owned by said parties.

\* \* \* \* \* \* \*

B. From and after the date hereof the said Mabel Ruth SoRelle shall take, have, hold and own as her sole and separate property and estate, free and clear of any interest therein or lien, claim or demand of any nature whatsoever on the part of the said A. W. SoRelle all of the following described property, and the said A. W. SoRelle does, by the execution of this instrument, hereby sell, assign, transfer and convey to the said Mabel Ruth SoRelle all of his right, title and interest in and to said following described property for which he hereby binds himself, his heirs, executors, administrators and assigns to the said Mabel Ruth SoRelle, her heirs, executors, administrators and assigns forever, to-wit:

(1) Lot Twenty-seven (27), Block One (1), Bivins Addition, an addition to the City of Amarillo, Potter County, Texas, on which there is now situated a home in which the parties are living, and all furniture and fixtures of every description now located and situated in said house.

(2) All personal property of every kind and character now owned by said second party and now in her possession.

(3) In further consideration of the execution of this contract, and in an attempt to equitably adjust the property rights as between the parties hereto, the party of the first part agrees to pay to party of the second part the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00); TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500.00) of said Twenty-five Thousand Dollars ($25,000.00) to be paid to party of the second part in cash upon the execution and return of this contract. First party is to execute his promissory note payable to second party in the sum of TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500.00); said note to be dated as of even date with this contract; is to bear interest at the rate of five percent (5%) per annum from date and is to be payable on or before one (1) year from date; said note is to be better secured by a mortgage upon Twelve Thousand bushels (12,000) of wheat owned by first party now located in a granary situated on the S-½ of Section 29, Block 6, I&GN Survey, Randall County, Texas.

Prior to March 15, 1947, Mabel filed a separate return for 1946 reporting gross income of $369.02 from interest and no tax thereon. The Commissioner's deficiency notice was mailed on January 8, 1952, more than 3 years following the filing of the return. The Commissioner contends that the 5-year statute of limitations in Internal Revenue Code, section 275 (c), applies.

The Commissioner has determined that the operating receipts of SoRelle's business from January 1 to March 25, 1946, totaled $117,579.43, of which $101,771.93 was from the sale of cattle; and that the community income figures of SoRelle and Mabel for that period were as follows:

|  | Total | Mabel's community share |
|---|---|---|
| Net ordinary business income | $32,589.85 | $16,294.93 |
| Capital gain recognized [1] | 26.89 | 13.44 |
| | | |
| Community income from business | $32,616.74 | $16,308.37 |

[1] From sale of spreader on March 20, 1946.

### OPINION.

We have found, in part I, *supra*, that cattle sales totaling $28,732.83 were made by SoRelle in December 1945, and erroneously recorded in his books as income for January 1946. Furthermore, we have adjusted the inventory valuations used in the Commissioner's computation of community income from January 1 to March 25, 1946, to accord with our findings of value pursuant to the farm-price method. The inventory for January 1, 1946, is the same as computed by us for that date in part I, *supra*, (exclusive of the wheat which was SoRelle's separate property). The inventory for March 25, 1946, is the same (again exclusive of the wheat) which we have computed in part I for May 25, 1946 (the date of SoRelle's and Elsie's marriage). There is no direct evidence relating to the March 25 inventory, but we find that the May 25 figures can be used since the additions to, and reductions of, the inventory between those two dates were approximately equal. Taking the aforementioned adjustments into account reduces the community income from SoRelle's business for the period January 1 to March 25, 1946, to $13,020.87, half of which is $6,510.44.

There is no evidence in the record indicating whether, and if so to what extent, income was earned by SoRelle's business between January 1, 1946, and February 19, 1946, the date of the separation agreement between SoRelle and Mabel. On both the original and amended returns for 1946, SoRelle reported as taxable to him the entire ordinary net income and capital gain arising from his business between January 1 and March 25, 1946.

The Commissioner's position on this issue is in the alternative: (1) In Docket No. 36411 (Estate of A. W. SoRelle, et al.) he has determined that all of the income realized in 1946, other than Elsie's community share for the period May 25–December 31, 1946, is taxable to SoRelle; (2) in Docket No. 39789 (Mabel Ruth SoRelle) he contends, obviously to cover all possibilities, that the income earned

between January 1 and March 25, 1946 (the period during which SoRelle and Mabel were married), is community income, half of which is taxable to the latter.

In these proceedings an unusual problem of proof is presented. In Docket No. 36411 (SoRelle) the petitioners must bear the burden of proving the Commissioner's determination incorrect by showing that income was earned during coverture of SoRelle and Mabel in 1946, which was community income taxable in part to the latter. Tax Court's Rules of Practice, Rule 32. However, in Docket No. 39789 (Mabel) the Commissioner must prove not only that the income earned between January 1 and March 25, 1946, was community income, half of which is taxable to Mabel, but, also, that Mabel's half of the community income for that period exceeded by more than 25 per cent the gross income she reported in her 1946 return. The Commissioner's burden results from the fact, as shown in our findings, that his deficiency notice was mailed more than 3 years but less than 5 years following the filing of Mabel's 1946 return. The 3-year statute of limitations has therefore expired and it is necessary for him to prove the facts establishing the exception extending the statute to 5 years. I. R. C., sec. 275 (a), (c), and (f) ;[8] *C. A. Reis,* 1 T. C. 9; *Edward F. Webber,* 21 T. C. 742.

Although Mabel and SoRelle were not divorced until March 25, 1946, they intended to and did separate permanently on January 24 of that year and, on February 19, entered into and executed an agreement in contemplation of divorce fully, completely, and finally disposing of all their property rights, including their interests in future income earned by each other. A reading of the agreement, the greater part of which is reprinted in our Findings, and a study of the surrounding circumstances leave no doubt that such was its intent and it would therefore serve no purpose to here repeat selected parts of it. The agreement was incorporated into the divorce decree of the parties.

---

[8] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.
Except as provided in section 276—
(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(c) OMISSION FROM GROSS INCOME.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(f) For the purposes of subsections (a), (b), (c), (d), and (e), a return filed before the last day prescribed by law for the filing thereof shall be considered as filed on such last day.

We must first consider whether income earned by SoRelle between February 19 and March 25, 1946, was his separate income or was income of the community of himself and Mabel. In *Chester Addison Jones*, 31 B. T. A. 55, affd. 82 F. 2d 329, we held that spouses in Texas who have already separated or determined upon immediate separation may, by agreement, determine the distribution of their property and "dissolve the community of property. *Rains* v. *Wheeler*, 76 Tex. 390; 13 S. W. 324; *Corrigan* v. *Goss* (Tex. Civ. App.), 160 S. W. 652." Following such an agreement the income earned by each spouse (even though earned before divorce) is taxable to that spouse alone.

Subsequent Texas decisions have confirmed the *Corrigan* doctrine. In *Selby* v. *Selby*, (Tex. Civ. App., 1941) 148 S. W. 2d 854, a case involving a slightly different question than *Corrigan*, *Corrigan* was cited with approval for the proposition with which we are here concerned. Following that, it was held in *Speckels* v. *Kneip*, (Tex. Civ. App., 1942) 170 S. W. 2d 255, that (citing *Rains* v. *Wheeler*, *supra*, which was also relied on in *Corrigan*) an executed separation agreement, which provided that afteracquired property was to be separate property, was valid and enforceable. Finally, it. was stated in *Coburn* v. *Collins*, (Tex. Civ. App., 1951) 244 S. W. 2d 526, 527, that "a verbal settlement of * * * [the spouses'] * * * joint affairs, after a permanent separation, was valid, and, ipso facto, dissolved the community; * * * *Rains* v. *Wheeler*, 76 Tex. 390, 13 S. W. 324, 23 Tex. Jur. 169; *Corrigan* v. *Goss*, Tex. Civ. App., 160 S. W. 652, writ refused."

We conclude that the *Corrigan* doctrine is the law of Texas and that, consequently, our decision in *Chester Addison Jones*, *supra*, is correct and applies here. The income earned by SoRelle between February 19 and March 25, 1946, is, therefore, his separate income and taxable entirely to him.

To the contrary, it is clear that any net income earned by SoRelle's farming and ranching business during the period January 1–February 18, 1946, is community income, taxable in equal shares to SoRelle and Mabel. However, although our findings indicate that the net income (including capital gain) from SoRelle's business for January 1 to March 25, 1946, was $13,020.87, we have also found that there is no evidence in the record indicating whether *any* of that income was earned prior to February 19, 1946. In the final analysis, therefore, this issue turns upon the burden of proof.

As mentioned at the outset, the Commissioner determined (in Docket No. 36411) that all of the net income earned by SoRelle's business in 1946 (other than Elsie's community share) was taxable to SoRelle.

Petitioners bear the burden of proving that some of that business income is taxable to Mabel because earned during the period January 1 to February 18, 1946. Although we do not think petitioners need show the exact amount of net income earned during the period January 1 to February 18, 1946, in order to sustain their burden, they must at least come forward with evidence indicating that *some* net income was then earned. See *Cohan* v. *Commissioner*, (C. A. 2) 39 F. 2d 540. This they have failed to do. We therefore hold that the petitioners in Docket No. 36411 have not carried their burden of proving that the Commissioner erred in his determination of this issue.

On the other hand, in Docket No. 39789, it was necessary for the Commissioner to prove, in order to take advantage of the 5-year statute of limitations in section 275 (c) of the Code, that the gross community income realized by Mabel in 1946 exceeded by more than 25 per cent the gross income reported in her 1946 return. The Commissioner has not produced such proof. Consequently, the assessment of any deficiency in Mabel's income tax for 1946 is barred by section 275 (a) of the Code.

## VI. *Negligence.*

### ISSUE.

Whether any part of the deficiencies in the income taxes of A. W. SoRelle and Elsie SoRelle for 1946 and 1947 was due to negligence.

### FINDINGS OF FACT.

Our Findings of Fact in parts I and IV, *supra*, are in part applicable to this issue. We find that SoRelle failed to keep adequate inventory accounts or a sufficiently accurate set of books. Furthermore, many uncontested adjustments were made by the Commissioner in SoRelle's returns for 1946 and 1947, including the inclusion in gross income of a number of items omitted by SoRelle. SoRelle's deficiencies for 1946 and 1947 were due, at least in part, to negligence. No part of Elsie's deficiencies for 1946 or 1947 was due to negligence.

### OPINION.

Section 293 (a) of the Code provides that a negligence penalty totaling 5 per cent of the deficiency will be assessed if "any part" of that deficiency is due either to (1) "negligence" or (2) "intentional disregard of rules and regulations but without intent to defraud." The burden of proving that the Commissioner erred in his determination of negligence penalties against SoRelle and Elsie for 1946 and 1947 rests upon petitioners. *J. T. S. Brown's Son Co.*, 10 T. C. 840.

SoRelle's books for 1946 and 1947 were kept, and his tax returns prepared, by bookkeepers and a certified public accountant. Nevertheless, he cannot escape responsibility for filing correct returns since the books were kept and returns prepared on the basis of information supplied by him. In his returns for 1946 and 1947, SoRelle omitted a number of items of gross income which were included in income in the Commissioner's deficiency determinations and were not contested by SoRelle. This alone justifies the imposition of negligence penalties. *Edward A. Hughes*, 27 B. T. A. 1022, affd. sub. nom. *Little* v. *Helvering*, (C. A. 8) 75 F. 2d 436; *L. Glenn Switzer*, 20 T. C. 759, 766. Moreover, the Commissioner's rules and regulations provide that a livestock raiser who uses inventories must keep accurate inventory records. Regs. 111, sec. 29.22 (c)–2; Mim. 5790, 1945 C. B. 72, 76. SoRelle failed to do this (which in part caused the deficiencies) and petitioners have offered no evidence sufficient to prove that such defection was other than an "intentional disregard" of those rules and regulations. Consequently, we sustain the negligence penalties determined against SoRelle.

Elsie's deficiencies resulted from improperly reported community income derived from SoRelle's business. Her interest in that income arose solely from the community property law of Texas and she had no partnership or other business arrangement with SoRelle. Under Texas law SoRelle, during coverture, had exclusive power of management and control over the community property as long as he discharged his obligation as head of the family. Vernon's Tex. Civ. Stat., art. 4619, sec. 1; *Herder* v. *Helvering*, (C. A., D. C.) 106 F. 2d 153, certiorari denied 308 U. S. 617, rehearing denied 308 U. S. 639. Elsie did not participate in SoRelle's business, in the accounting of the business income, or in the preparation of the returns. In fact, she had no bookkeeping or accounting experience and was wholly unfamiliar with SoRelle's books. These facts are almost identical to those in *L. Glenn Switzer*, *supra*, where we said:

As to the two wives, it is stipulated that their interest in the partnership income arises from the community property law of the State of California. Under that law, the management and control of the community property is vested in the husband. * * * The record does not show that the wives participated in any way in the business of the partnership, in the management of its affairs, in the accounting of the income produced therefrom, or in the preparation of the returns. We, therefore, conclude that as to the wives, * * * the 5 per cent addition to the tax may not be asserted * * *.

Accordingly, we hold that the Commissioner erred in asserting negligence penalties against Elsie for 1946 and 1947.

*Decisions will be entered under Rule 50.*