Bernard B. Carter (B. B. Carter) and Tommie Velma Carter, Husband and Wife v. Commissioner.
Carter v. Commissioner
Docket No. 52795.
United States Tax Court
T.C. Memo 1957-65; 1957 Tax Ct. Memo LEXIS 186; 16 T.C.M. (CCH) 280; T.C.M. (RIA) 57065; April 25, 1957
*186 Held: (1) The sale of 19 head of cattle for $3,146.29, although recorded on the books of the purchasers as a sale from the petitioner, was not a sale by the petitioner but was a sale by petitioner's brother of cattle owned by him and respondent erred in increasing the petitioner's income from cattle sales by that amount. The question of whether expenses in the amount of $3,122.32, reimbursed as part of the same transaction as the $3,146.29 item, constituted income to the petitioner was not raised by the pleadings and is not properly before the Court. (2) Petitioner's method of accounting was the cash basis plus inventories. Respondent accepted this method as clearly reflecting petitioner's income and made certain adjustments to petitioner's opening and closing inventories. Respondent's adjustments sustained. (3) Patronage dividend certificates with a face value of $763.55 were not income to petitioner in the year received since they had no fair market value. (4) Respondent's disallowance of certain labor expenses on ground that the expenditures were not business expenses is sustained. (5) Respondent's disallowance of certain automobile expense on ground that it was incurred in personal *187 use is sustained. (6) Petitioner's claim asserted in an amended answer that certain cattle were part of a breeding herd which, when sold, resulted in long-term capital gain under section 117(j), Internal Revenue Code of 1939, is denied because of insufficient evidence to sustain it. Wentworth T. Durant, Esq., for the petitioners. Robert B. Wallace, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent has determined a deficiency in income tax of the petitioners in the amount of $17,746.83 for the year 1948. The deficiency results from numerous adjustments, some of which are not contested. The petitioners contest the following adjustments: (1) increase in cattle sales by $3,146.29; (2) increase in value of cattle inventory on December 31, 1948, and adding both opening and closing *188 grain inventories; (3) including in gross income the face value of patronage dividends credited to petitioner's account by a grain cooperative; (4) decreasing labor expenses of $4,715.98 of the amount claimed by petitioners on their joint return; and (5) decreasing automobile expenses by $300, the amount which the Commissioner determined was expended by petitioners for personal use. In their amended petition the petitioners raised another issue (6) affirmatively contending that the Commissioner erred in failing to treat the sale of 384 heifers as the sale of section 117(j), Internal Revenue Code of 1939, property. They contend that the 384 heifers constituted part of petitioner's breeding herd and that the alleged gain of $29,311.04 that resulted from the sale was a long-term capital gain and not ordinary income as treated on the joint return. Findings of Fact B. B. Carter (hereinafter referred to as the petitioner) and Tommie Velma Carter are husband and wife and reside near Amarillo, Texas. They filed their joint income tax return for the year 1948 with the then collector of internal revenue for the second district of Texas. The petitioner had no education, training, or experience *189 in keeping books. His life-long business had been that of farming and ranching. During the year 1948, he operated a ranch about 100 miles from Amarillo; he operated a farm about 55 miles from Amarillo; he rented some land to others; and he was interested in an oil drilling operation in Wyoming. Issue 1. Additional Cattle Sales Petitioner gave his brother, Sid H. Carter (hereinafter referred to as Sid), permission to draw on his account at his bank to pay for some cattle which they were going to purchase jointly. In June 1948, Sid drew a draft for $6,000 to the order of A. J. Irwin on the petitioner to use as escrow money in the purchase of the cattle. In October 1948, Sid drew another draft on petitioner for $47,859.25 to the order of A. J. Irwin. The total amount of the two drafts was $53,859.25; it was the selling price for the 359 head of cattle that Irwin was selling to the purchasers. The petitioner borrowed money and deposited it in his bank in order to cover the drafts. The $6,000 draft was paid in full. Sid sold 19 of the 359 head of cattle for $3,146.29. The sale was recorded in the name of the petitioner on the Amarillo Livestock Auction Company's records of sales. The *190 proceeds of $3,146.29 were applied by Sid to the $47,859.25 draft drawn on petitioner, thereby reducing the balance thereon to $44,712.96. The draft was honored for that balance by the petitioner's bank. The cattle that Sid purchased were kept on petitioner's farm. The petitioner expended the following amounts in connection with the above transactions (in addition to the $6,000 and $44,712.96 described above): Interest on money borrowed to
cover drafts
$ 417.51
Trucking expense
588.48
Wheat pasture expense
2,116.33
Total expenses
$3,122.32
The total amount expended by petitioner in connection with the purchase of the 359 head of cattle from A. J. Irwin was as follows: Draft - Initial deposit in escrow
$ 6,000.00
Draft for balance of purchase price
($47,859.25 less $3,146.29)
44,712.96
Expenses, supra
3,122.32
$53,835.28 Sid decided to buy out the petitioner's interest in the cattle. He reimbursed the petitioner for the amount expended by giving him a check for $53,835.28. This check was deposited to petitioner's account January 6, 1949. In his deficiency notice the Commissioner has increased the $200,573.22 cattle sales reported *191 by petitioner to $203,719.51, an increase of $3,146.29. He explains this adjustment in his deficiency notice as follows: "(1) Sale of cattle to Amarillo Livestock Auction Company on October 18, 1948." This sale of cattle for $3,146.29 was made by Sid and not by petitioner. The proceeds belonged to Sid and he used them in reducing the draft for balance of purchase price as shown above. Issue 2. Inventories The petitioner filed his first income tax return for the year 1940. He kept no books and knew nothing about the various accounting methods. In 1948, a journal was maintained, apparently from canceled checks and deposit slips. On the recommendation of his banker, he retained a certified public accountant in Amarillo to prepare his 1940 return. He turned over to the accountant's office his canceled checks, deposit slips, and certain other pertinent information. The accountant's employees summarized the information on worksheets, made some adjustments, and prepared the returns. Petitioner left everything entirely up to the accountant but he did sign the returns. During the year 1940, petitioner bought and sold 150 head of cattle. The accountant had no knowledge of any inventories *192 that might have existed on December 31, 1940. He showed no inventories on the return. The return indicated that it was filed on the cash basis. The same accountant also prepared all of the petitioner's income tax returns through 1948. The 1941 return indicated that it was filed on the cash basis. This return showed no opening inventory and no livestock sales, but it did show an ending inventory of livestock. In a letter dated August 20, 1942, the respondent's agent inquired of Carter whether all of the animals included in his closing inventory on the 1941 return were purchased or raised during the year and, if not, the amount on hand at the beginning of the year. The accountant, after consulting with Carter, answered the inquiry. He stated that all of the animals were purchased during the year and that there was no opening inventory. Thereafter, inventories of livestock were shown on all returns through 1948. The 1948 return showed inventory on January 1, 1948, of cattle with a value of $121,080, and on December 31, 1948, of cattle with a value of $68,857.99. Other records show that the cattle inventory on January 1, 1948, contained 1,009 head of cattle. The records do not show *193 how many of these cattle were heifers. On January 7, 1949, petitioner sold 266 head of cattle for $32,697.99; these cattle had a value as at December 31, 1948, of $31,920. On January 19, 1949, petitioner sold 226 head of cattle for $44,381.64; these cattle had a value as at December 31, 1948, of $42,187.50. Petitioner did not purchase any cattle between January 1, 1949 and January 19, 1949. The inventory value of cattle on December 31, 1948, was $74,107.50 ($31,920 plus $42,187.50). In reporting gross income from cattle sales in 1948, petitioners, in their return, reported as follows: Cattle Sales
$200,573.22
Less: Cost of Cattle Sold
Inventory 1-1-48
$121,080.00
Purchases
53,327.53
$174,407.53
Less: Inventory 12-31-48
68,857.99
Cost of cattle sold
105,549.54
Gross income of cattle sales
$ 95,023.68
No grain inventories were shown on the 1940 and 1941 returns. During some of the years in the middle 1940's, grain inventories were shown. No grain inventories were shown on either the 1947 or 1948 return. The records of the Stratford Grain Company, Stratford, Texas, showed that petitioner had grain on hand on January 1, 1948, the value *194 of which was $5,580.58, and on December 31, 1948, the value of which was $4,428. The Commissioner in his determination of the deficiency increased petitioner's opening inventory from $121,080, as reported on the return, to $126,660.58. This increase was due to the addition by respondent of wheat inventory of $5,580.58, that being the amount of wheat which the records of the Stratford Grain Company showed that petitioner had on hand January 1, 1948. The Commissioner also added to petitioner's closing inventory December 31, 1948, an inventory of wheat of $4,428. This was the value of the amount of wheat which the records of the Stratford Grain Company showed that petitioner had on hand December 31, 1948. The petitioners' returns, except for the inventories which were shown, were prepared on the cash basis. Issue 3. Patronage Dividends During the year 1948, the petitioner received patronage dividend certificates with a face value of $763.55 from the Adrian Wheat Growers, Inc., a cooperative grain elevator in Amarillo, Texas. That amount was credited to petitioner's account by the cooperative during 1948. At the end of 1948, the cooperative was doing business. The petitioner had *195 not heard of anyone collecting any money on the certificates and he threw them away after he received them. He has never collected anything from these dividend certificates. The patronage dividend certificates had no fair market value in the year when the petitioner received them. Issue 4. Labor Expense The respondent disallowed $4,715.98 as a deduction for labor expense and described this disallowance in his deficiency notice, as follows: Check dated 11-8-48 to O. D. Williams,
expense of partnership, Carter and
Beck
$1,625.98
Check dated 11-27-48 to Mrs. Douglas
Moreland, your daughter
300.00
Gift to Douglas Moreland
1,000.00
Loan to Claude Wells
1,790.00
$4,715.98
Claude Wells and his wife were employed by the petitioner on his ranch. The petitioner paid Wells for his and his wife's services during 1948. In January 1949, Wells repaid the petitioner $1,790. The petitioner deducted the entire amount paid to Wells during 1948 as labor expense. Petitioners have not substantiated any of the amounts disallowed by the Commissioner as ordinary and necessary business expenses. Issue 5. Automobile Expense During the year 1948, the petitioner owned *196 three cars. One was kept in Wyoming, where he was carrying on drilling operations, and the other two were kept at his home. Petitioner had no business or office in Amarillo. He used the two automobiles that were kept at his home for business and pleasure, including trips to his ranch, to his farm, and to Wyoming. He would also frequently fly rather than drive to Wyoming. On his 1948 return he deducted $2,035 as travel expense, $1,045.17 as depreciation expenses for an automobile used in Wyoming, and $4,644.58 as oil and gas expenses. He maintained no record of the oil and gas expenses. The respondent, in his deficiency notice, disallowed deductions in the amount of $300. The Commissioner explained this disallowance in his deficiency notice, as follows: "Estimated amount of expenses applicable to personal use of automobile in 1948 is eliminated from business expenses." Petitioner has not proved that this adjustment was error. Issue 6. Breeding Herd The petitioner was in the business of buying and selling cattle from 1940 through 1948, the year in question. In 1948, income from cattle sales constituted about 60 per cent of petitioner's gross income. Prior to 1948, he purchased *197 all of his cattle, rather than raise them. He ordinarily purchased "stocker" cattle which he described as "anything from a weaner calf up to 3-year old steers or heifers that hasn't yet much flesh on him and they are at the right stage to put on wheat pastures or grass to where they would put on pounds." He acquired most of his stocker cattle from Old Mexico where the price was less than it was in the United States. In the latter part of 1946 or early 1947, after he had contracted to purchase a herd of cattle in Mexico, the Mexican border was closed to cattle exportation because of the hoof and mouth disease. He never received delivery of these cattle. The price of cattle in the United States increased at that time. In April 1947, the petitioner purchased about 800 short 2-year olds head of cattle from Roy Williams. These cattle were located on the Pyle ranch, near Pecos, Texas. This herd contained about one-half heifers and one-half steers. They were good quality Hereford cattle, but were in poor condition. Petitioner separated the steers from the heifers and put them in separate pastures. In June 1947, petitioner put some registered Hereford bulls, which he owned, in with the heifers *198 to serve them. He left the bulls with the heifers until September or October 1947, by which time he considered they had all been bred. In December 1947, weather conditions rendered it extremely difficult for trucks to haul feed to the cattle. Petitioner then decided to sell all of his cattle, including the heifers which had been bred. He had about 1,000 head of cattle at that time. About January 17, 1948, petitioner sold 201 yearlings to his brother, Sid. Those cattle were not a part of the herd acquired from Williams in April 1947. The rest of the cattle, i.e., the approximately 800 which he had purchased from Williams were hauled to Oklahoma City and placed in feed lots for the purpose of getting them ready for sale. These cattle were all sold by an agency in a series of sales in March and April 1948. The petitioner entered the net sales price that he received from these sales in his cash journal. The journal reflected the following receipts from the sale of cattle during March and April 1948: March 29
$ 5,292.00
March 24
5,396.70
April 5
137,521.90 The journal does not reflect separately the amounts received for the heifers. The cattle were apparently sold *199 without the heifers and steers being segregated. The petitioner received about $75,000 from the sale of heifers, which constituted about one-half of the 800 cattle in the herd. Petitioners reported their gross income from the sale of cattle in 1948, including those mentioned above, in the manner we have detailed under Issue 2. The petitioner was not in the business of breeding cattle and he had not established a breeding herd. The approximately 400 heifers purchased by petitioner from Roy Williams in April 1947 were not used in trade or business; they were held for sale in the ordinary course of petitioner's primary business of buying, feeding, and selling cattle. Opinion BLACK, Judge: We will discuss the issues in the same order as they appear in the Findings of Fact. Issue 1. The Commissioner, in his deficiency notice, increased the petitioner's cattle sales by $3,146.29 and explained the adjustment as follows: "Sale of cattle to Amarillo Livestock Auction Company on October 18, 1948." The item in question is the proceeds from the sale of 19 of the 359 head of cattle that petitioner and Sid purchased jointly prior to the date of this sale. Sid applied the proceeds to the *200 draft drawn on petitioner, which draft was for the balance of the purchase price of the 359 head of cattle. The $3,146.29 sale was recorded on the books of Amarillo Livestock Auction Company in the name of petitioner. It was not in reality a sale by petitioner of his cattle, but rather was a sale by Sid of cattle owned by him. The facts show that Sid and petitioner started out in June 1948 with the intention to buy these cattle jointly and to own them jointly. However, after the cattle had been acquired, it was agreed between the brothers that Sid would be the owner of the cattle and would reimburse petitioner for the money which he had expended in their purchase. This was done. The $3,146.29 which was received as the proceeds from the sale of 19 of the cattle was used by Sid as a payment on the draft which had been drawn on petitioner to pay for the cattle. Sid later gave his check to petitioner to pay in full the amount of money which petitioner had expended on these cattle. These facts are shown in our Findings of Fact under Issue 1. Thus it appears that the $3,146.29 in question was gross income to Sid, and not to petitioner. We do not understand that the Commissioner now contends *201 otherwise. What he does contend is that instead of adding $3,146.29 to the income reported by petitioners on their joint return as sales of cattle not reported by them, he should have added $3,122.32 to the net income reported by petitioners on their return as reimbursed expenses deducted on the return. On brief respondent argues that these reimbursed expenses were as follows: Interest paid by petitioner on
the loan
$ 417.51
Trucking expense
588.48
Wheat pasture expense
2,116.33 He argues that these expenses were deducted by petitioners on their return and that inasmuch as petitioners were reimbursed for them when Sid gave his check of $53,835.28 to petitioner to reimburse him for what he had expended in the cattle purchase, they represented income to petitioner. Respondent made no mention of such proposed adjustments in his deficiency notice. In his answer he does not plead affirmatively that he erred in adding to petitioners' income $3,146.29 as additional sales of cattle and that the foregoing expense items which aggregate $3,122.32 should be disallowed as deductions or included in income as reimbursed expenses. These items, although connected with the same *202 transaction as the $3,146.29 item, are separate and distinct. As we have said, there was no mention of it in the deficiency notice or in the pleadings. This is not a case of the respondent's trying to support an adjustment made in the deficiency notice on grounds other than those originally set forth. See Hilbert L. Bair, (1951) 16 T.C. 90, 98, affd. (C.A. 2, 1952) 199 Fed. (2d) 589. Here, he is proposing an entirely new adjustment which, although somewhat similar in amount, is dissimilar in nature. Such an issue is not properly before us unless it is properly pleaded. Cf. Cedar Valley Distillery, Inc., (1951) 16 T.C. 870, 879. This has not been done. If respondent had properly amended his answer to have affirmatively pleaded that he should have disallowed these items of expenses on the ground that petitioners had deducted them on their return but had been reimbursed for them by Sid, the burden would have been on respondent to prove that petitioners had deducted them on their 1948 return. There is no such proof in the record. We hold for petitioner as to Issue 1. Issue 2. The petitioner's 1948 return used both opening and closing inventories *203 of cattle in computing his income. The respondent, in the deficiency notice, made adjustments to both the opening and closing inventories. The facts in the record support these adjustments and we have made our findings accordingly. The basic rule is that taxable income must be computed in accordance with the method of accounting which the taxpayer regularly employed in keeping his books, but if that method does not clearly reflect income the computation is to be made in accordance with such method as in the opinion of the Commissioner does clearly reflect income. At the very outset of our discussion of Issue 2, it should be pointed out that this is not a case where the Commissioner has determined that the method used by petitioner did not clearly reflect his income and that he should be put on some other method of accounting. The adjustments which the Commissioner has made in the deficiency notice are made to the income and deductions as reported by petitioners in their return. The petitioner, however, contends that in the taxable year 1948, he erroneously used inventories since he filed his first return in 1940 on the cash basis; that he never received permission to change methods; *204 and that, therefore, as a matter of law, he should not use inventories. We cannot agree. It is true that the petitioner's first return was marked cash basis and that no permission to change his method of accounting was received. However, the petitioner did not have any inventories on December 31, 1940. The accountant, to whom petitioner gave full authority and discretion regarding his returns, did not know of any inventories on December 31, 1940. In 1941, when there were inventories, the accountant elected to use them in computing income. The 1941 return was also marked cash basis, notwithstanding that inventories were used. Petitioners' returns have consistently used livestock inventories through 1948. It seems clear from the record that petitioner has consistently used the cash basis plus inventories in computing income. Petitioner argues that the cash basis plus inventories is a hybrid method and is not a permissible method of computing income. In Elsie SoRelle, (1954) 22 T.C. 459, 469-470, we recognized that income returned on a cash basis plus inventories could clearly reflect income if there were no accounts receivable or accounts payable in regard to the purchase *205 and sale of the items which were inventoried. In the instant case, although the record is not clear, it indicates that the petitioner bought and sold his cattle by paying or receiving cash at the time of the transaction and, therefore, did not have any account receivable or account payable. Aside from that, the effect of the respondent's determination is to uphold the petitioner's method of reporting his income as clearly reflecting income. Petitioner has not proved any facts which would justify us in holding that the Commissioner's determination is in error. We sustain the Commissioner in his adjustments involved in Issue 2. Issue 3. In the year 1948, the petitioner received patronage dividend certificates with a face value of $763.55. This was not returned by the petitioner as gross income. The Commissioner determined that petitioner's income should be increased by the face value of the certificates. The certificates were not income to a cash basis taxpayer if they had no fair market value at the time received. B. A. Carpenter, (1953) 20 T.C. 603, 606-608, affd. (C.A. 5, 1953) 219 Fed. (2d) 635. We have found as a fact that the certificates had no *206 fair market value in the year when received. The Commissioner's determination is, therefore, reversed. Issue 4. Of the $4,715.98 disallowed by the respondent as labor expenses, the petitioner in his amended petition objects to the disallowance of $790 of the $1,790 disallowed as labor expense payments to Claude Wells. He does not question the disallowance of the other items included in this total of $4,715.98. The petitioner does not press this issue on his brief. There being insufficient evidence to overcome the presumptive correctness of the respondent's determination, we, therefore, uphold that determination. Issue 5. The petitioner has not introduced any evidence that would tend to disprove the respondent's determination that $300 of the automobile expense was for personal use and not deductible under section 23 of the 1939 Code. He contends, however, that the determination is arbitrary because the revenue agent testified that the disallowance was based, to some extent, on his (revenue agent's) own experience regarding the cost of operating a car for personal affairs in and about Amarillo. Considering the fact that the cars were used partly for pleasure and that petitioner *207 kept no records segregating the cost incurred in business use. we cannot say that the respondent's determination is incorrect. Accordingly, the respondent's determination is upheld. Issue 6. The petitioner returned all of his income from cattle sales as ordinary income. The respondent did not disturb the petitioner's return in that respect. He only made adjustments as to amounts as shown in Issues 1 and 2. The petitioner, in his amended petition, claims that he erred in reporting all of the income from cattle sales as ordinary income. He claims that included in his ordinary income is the gain from the sale of 384 heifers which were a part of his breeding herd. Petitioner claims in his brief that these 384 heifers were sold for $75,391.04; that they had a cost basis of $46,080, [1] that the gain resulting from the sale was $29,311.04; and that this gain should be treated as long-term capital gain instead of ordinary income. *208 The only evidence relating to this issue is the testimony of the petitioner. No book records or documentary evidence of any kind regarding the number of cattle or the amounts involved were put in evidence. Petitioner testified that he purchased about 800 head of cattle from Williams in April 1947; that about one-half of them were heifers; that he separated the heifers from the steers and placed some bulls in with the heifers in order to breed the heifers; that because of the weather in December 1947, he could not haul any feed to the herd; that he then decided to sell all of his cattle; that he shipped them to Oklahoma City, put them in feed lots and subsequently sold them in March and April of 1948; and that the approximately 384 heifers sold for about $75,000. We do not think these facts are sufficient to establish a breeding herd, i.e., that the heifers were property used in trade or business of breeding cattle and "not held primarily for sale to customers in the ordinary course of business." The record indicates that petitioner purchased the 800 cattle from Williams without any distinction being made between heifers and steers, and that they were sold by petitioner without *209 any distinction being made between the heifers and steers. The court in Albright v. United States, (C.A. 8) 173 Fed. (2d) 339, 342, determined the applicability of section 117(j)(1) of the 1939 Code as follows: "In order for the taxpayer to come within the provisions of section 117(j) permitting him to treat the sales from his dairy and breeding herds as sales of capital assets, the burden is upon him to show: (1) that the animals sold were used in his trade or business; (2) were subject to allowance for depreciation; (3) were held for more than six months; (4) were not property of the kind includible in the inventory of the taxpayer if on hand at the close of the taxable year; and (5) that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *" For our present purpose items "(1) that the animals sold were used in his trade or business" and "(5) that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" are the controlling factors. We do not think the record supports a finding that about one-half of the 800 cattle that were *210 purchased from Williams in 1947 were used in petitioner's trade or business of breeding cattle. We do not think that the record would justify us in making a finding of fact that petitioner was engaged in the business of breeding cattle and we have not done so. At most, it indicates a desire to start a breeding herd. The record shows, in our opinion, that desire was never fulfilled. Nor do we think, after all the evidence is considered, that it has been shown that the heifers in question were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. As to Issue 6, petitioners are not sustained. Decision will be entered under Rule 50. Footnotes
1. Petitioner has not alleged or shown the basis for computing the gain or loss on the sale of his alleged breeding herd. The alleged breeding herd is included in his January 1, 1948 inventory which showed 1,009 cattle at a value of $121,080. In his brief he states that the basis of the 384 head of cattle is $46,080 (1,009 divided by 384 times $121,080, or $120 a head) There is no evidence supporting his statement, and in view of the fact that the 1,009 head of cattle contained yearling heifers, 2-year old heifers and steers, we could not assume that they were all included in the inventory at equal values.↩