Pete Elia and Leonie Elia v. Commissioner.
Elia v. Commissioner
Docket No. 56257.
United States Tax Court
T.C. Memo 1957-238; 1957 Tax Ct. Memo LEXIS 12; 16 T.C.M. (CCH) 1097; T.C.M. (RIA) 57238; December 27, 1957
*12 Held: The election to include in inventory livestock purchased for breeding purposes is binding on the taxpayers for subsequent years and may not be changed without approval of the Commissioner of Internal Revenue. Held: Regulations 111, sec. 29.23(1)-10, which disallows depreciation of livestock purchased for breeding purposes if included in the inventory, is valid. Eli Grubic, Esq., for the petitioners. Aaron S. Resnik, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency of $11,244.54 in petitioners' income tax for the year 1948. Of this deficiency, petitioners dispute only $5,211.86 resulting from the disallowance of depreciation on certain livestock. Findings of Fact This case was submitted on the basis of a stipulation of facts and depositions submitted at the time of trial. The stipulated facts are adopted as findings of fact. Petitioners are individuals, husband and wife, and residents of Elko, Nevada. At all times material to this proceeding, and commencing as early as 1925, petitioners were engaged in the business of breeding and raising sheep for mutton and for wool. They filed a joint return for the calendar year 1948 with the then collector of internal revenue for the district of Nevada at Reno, Nevada. Petitioners' operation begins in October of each year when their herd is driven from Ruby Mountains near Elko to New Pass in Lander County, Nevada, where the ewes are bred. The breeding period usually lasts six weeks. *14 About December 1, after the breeding has been completed, the herd is driven from New Pass to Luning Summit in Mineral County, Nevada, about 300 miles from Ruby Mountains, where it stays on a government range for three months. There the rams are kept separated from the ewes. On March 1, the herd is moved to Beowawe in Eureka County, Nevada, where the wool is sheared from the sheep. After the shearing has been completed, the ewes are moved to Carlin in Eureka and Elko Counties, Nevada, for the lambing season, approximately from April 15 to June 15. After the lambing season, the herd is returned to Ruby Mountains for summer grazing. The herd is culled in September. At that time, the old ewes are sold off as are the young lambs from the spring crop except for those lambs retained to replace lost or culled ewes. By October the herd consists of the ewes, the retained lambs, the rams, and miscellaneous other livestock such as horses, mules, and burros. Normally, about 1,000 lambs are retained from the spring crop to replace old or lost ewes. These lambs are 17 or 18 months old before being bred for the first time, and they drop their first lambs 4 to 6 months later. After its first lamb *15 is dropped, a ewe as a breeder has an average useful life of five years and an average salvage value of $5.00. The petitioners inventoried all livestock by the unit-livestock-price method. Purchased livestock were inventoried at cost. Raised ewes and lambs were included in inventory at the following agreed values: Ewes
$9.44
Lambs
6.00
Raised and purchased livestock were allowed to graze together. They were never separated. Sales were recorded on a first-in, first-out basis, except on the infrequent occasion when absolute identity permitted a charge to a specific group. Raised ewes bore a special "earmark". However, when petitioners sold ewes, they made no effort to determine which sales represented purchased ewes or which represented bred ewes. No records were kept concerning the ages or the origin of the ewes. Petitioners have never depreciated the value of the breeding livestock. Petitioners purchased 2,183 ewes at $10 each in 1947, some of which were on hand as of the end of the calendar year although no identification of this group was made in the final inventory. After adjustments, the livestock inventory on January 1, 1948, was as follows: Unit
Description
Quantity
Value
Total Valuations
Ewes
5,000
$ 9.44
$47,200
Lambs
1,000
6.00
6,000
Rams
35
65.00
$2,275
85
30.00
2,550
4,825
Mules
8
75.00
600
Horses
5
118.00
590
2
75.00
150
740
Burros
5
30.00
150
TOTAL
$59,515
*16 The petitioners maintained very meager books and records. The sole available record pertaining to the year 1948 is a half-page ledger sheet listing petitioners' sales and showing total sales for that year of $228,725.50. Although a brief record of purchases is available for 1947 and 1949, no record of purchases was submitted for 1948, the year in question. Taking the record of sales, together with the depositions of Pete Elia and his accountant, we find the following transactions to have occurred in 1948: 3/24/48
Purchased 3,683 ewes at $22 each for *z2*a total cost of $81,026. $3 per ewe was
allocated by the petitioners as the cost
of the wool on the fully loaded ewes.
4/11/48
Sold the wool from the above ewes for
$10,496.68.
4/11/48
Sold 1,000 ewes from the above pur-
chase at $25 each for a total of $25,000.
These ewes were the best of the lot
purchased. The remaining 2,683 ewes
from the above purchase were added
to the inventory. The ages and the
number within the age groupings of
the sheep, which were purchased and
added to inventory, were estimated as
follows: Life
Age
Number
Expectancy
2
550
6
3
500
5
4
500
4
5
500
3
6
400
2
7
350
1
4/11/48
Sold 53,899 pounds of wool for
$24,144.93.
6/19/48
Sold 4,998 lambs for $88,793.15. These
lambs were from the spring lambing
season and were not entered into in-
ventory.
6/19/48
Sold 1,337 old ewes for $13,370.
7/10/48
Purchased 128 ewes at $15 each for a
total cost of $1,920. This purchase was
made as an accommodation for a
neighbor and did not enter into the
livestock inventory of petitioners.
10/ 6/48
Sold 1,103 ewe lambs for $22,060.
*17 Other transactions were: Purchased 81 cows for
$ 9,725.00
Sold these cows at various times for
10,127.44
Purchased 140 rams for
5,020.00
Sold 42 rams for
1,733.50
Petitioners lost 70 rams during the
1948 year operation.
The closing inventory on December 31, 1948, as stated on the petitioners' 1948 income tax return, was as follows: Description
Quantity
Unit Value
Total Valuations
Ewes
4,717
$ 9.44
$ 44,528.48
4,403
22.00
96,866.00
Lambs
1,000
6.00
6,000.00
Rams
148
30.00
$4,440.00
30
20.00
600.00
5,040.00
Horses, Mules, and Burros
21
1,375.00
TOTAL
$153,809.48
The estimate of ages and numbers of ewes purchased on March 24, 1948, was that of the seller conveyed to the petitioners either directly or through a third party. The estimate was not based upon an inspection or a count by the petitioners themselves. The expected useful life was based on petitioners' past experience with their own herd. In 1952, petitioners were prevailed upon by an internal revenue agent to replace their bookkeeper with a new accountant because their books and records were incomplete and unsatisfactory. *18 The records for the year in question are manifestly inadequate. The ewes were culled without distinction between raised or purchased ewes. The sole determining factor was their physical condition. Ewes whose mouths showed signs of cracking or loss of teeth, any diseased ewes, or those which had some malformation were sold. These conditions may appear in younger ewes, but most frequently in the older ones. Petitioners kept no age records of the ewes culled, purchased, raised, or retained in the herd, nor were records kept as to the origin of the ewes sold, other than in the case of the single transaction on April 11, 1948, when 1,000 choice ewes were sold from the purchase of March 24, 1948. For several years, including the year in question, the inventory of breeding livestock was included in the computation of the cost of goods sold on petitioners' tax returns. While total sales included the sales of the spring lamb crop, no cost value was ever assigned to them. Petitioners, on their tax return for 1948, reported total sales of $165,699.26, a gross profit on sales of $147,287.74, and a net profit of $40,844.12. No depreciation or reduction in value of the purchased ewes was *19 claimed on the return. In July 1953, petitioners signed a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessments, for the taxable year 1948, in the amount of $6,032.68. By letter dated February 12, 1954, petitioners were notified of a proposed deficiency in the amount of $11,130.40 for the taxable year 1948. Petitioners filed a protest to this proposed deficiency in March 1954. The basis for this protest was the disallowance of depreciation on purchased breeding livestock. Although there had been some discussion of the depreciation question at the time the deficiency of $6,032.68 was agreed to by petitioners, no formal claim for depreciation was made prior to the protest. On November 16, 1954, respondent mailed a statutory notice of deficiency in the amount of $11,244.54 for the year 1948. In the statement attached to the notice of deficiency, gross sales were stated at $202,524.65, gross profits on sales at $152,754.81, and net income from ranching at $55,363.39. The right to depreciate the purchased breeding livestock, asserted by petitioners in their protest, was disallowed by respondent because he determined that (1) the *20 use of depreciation would constitute a change in the accounting methods consistently employed by the petitioners previously and must be denied because permission had not been requested or granted to change accounting methods, (2) separate accounts and age records of the breeding stock were not kept, and (3) no segregation or other means of identification of the livestock on which depreciation is claimed was established. Opinion The question to be decided is whether petitioners are entitled to depreciation on their purchased breeding herd which was included in inventory. The closing inventory for 1948, as shown on petitioners' income tax return for that year, appears to be largely without support either in the petitioners' books and records, such as they were, or in the depositions. Petitioners showed an opening inventory for 1948 of 5,000 raised ewes valued at $9.44 per head. The only transaction involving these ewes during the course of the year was the sale of 1,337 head. Pete Elia testified further that on the average there would be an annual loss of about ten percent. Yet, petitioners' closing inventory shows 4,717 of these ewes on hand at the close of 1948. Petitioner *21 Pete Elia also testified to the purchase of 3,683 ewes at $22 each on March 24, 1948, from one Goyeneche, and the sale on April 11, 1948, of 1,000 of these ewes. However, petitioners' 1948 return showed the purchase of 6,040 such ewes and reported 4,403 ewes valued at $22 each as on hand at the close of 1948. At the same time, the petitioners' 1949 return showed an opening inventory of this same category of ewes on January 1, 1949, of only 2,283. Putting aside the inadequacies and inconsistencies in the available record, it is the 2,683 purchased ewes remaining from the Goyeneche purchase on which petitioners now claim depreciation, while at the same time they seek to continue them in inventory. In 1948 and prior years, petitioners inventoried all of their livestock, both raised and purchased, by the unit-livestock-price method. [1] Once this method has been elected, the regulations require that it must be applied consistently to all raised livestock, whether for sale or for breeding, dairy, or draft purposes, and no changes in the unit prices or classifications can be made without approval of the Commissioner. Regulations 111, sec. 29.22(c)-6, as amended by T.D. 5423, 1945 C.B. 70. *22 These same Regulations 111, 1945 C.B. at page 71, make the following special provision for livestock raisers on the unit-livestock-price method, who purchase breeding, dairy, or draft animals: "* * * animals purchased for breeding, dairy, or draft purposes can, at the election of the livestock raiser, be included in inventory or be treated as capital assets subject to depreciation after maturity." [Italics added] Petitioners elected to inventory, at cost, the livestock purchased for breeding purposes. Regulations 111, sec. 29.23(1)-10, specifically provides: "If such livestock be included in an inventory no depreciation thereof will be allowed, as the corresponding reduction in their value will be reflected in the inventory * * *." See also Regulations 111, sec. 29.23(a)-11. Thus, the effect of their election to inventory was that petitioners were not entitled *23 under the regulations to depreciate their purchased breeding livestock. Petitioners computed their net income for the years prior to the year in question without claiming a depreciation allowance with respect to their breeding livestock. The right to depreciate certain of the purchased breeding livestock was asserted by the petitioners for the first time when their 1948 return was being examined by one of the respondent's agents. In Jack Frost, 28 T.C. - (August 30, 1957), and in Elsie SoRelle, 22 T.C. 459 (1954), this Court decided issues similar to the one involved in the instant case. In Jack Frost, the taxpayer had adopted the unit-livestock-price method and had elected to inventory his purchased breeding stock. After consistently following this course for several years, the taxpayer sought to obtain a depreciation deduction on the breeding livestock and removed the specific stock from inventory and capitalized their value. This Court held that, having once elected to inventory the purchased breeding livestock, the election was binding upon the taxpayer for subsequent years and he could not change the method adopted without approval of the Commissioner. The *24 facts in the instant case are even more unfavorable to the position of the petitioners than the facts in Jack Frost, supra. In the latter case, the taxpayer sought to remove his breeding herd from inventory and place it on a depreciation schedule. Here, the petitioners seek to continue the previously adopted method of inventorying purchased livestock and at the same time claim an allowance for depreciation with respect to the same livestock. In addition, petitioners here do not assert the right to depreciate all of their purchased breeding livestock but only a portion of that category, namely, the animals purchased from Goyeneche. In the SoRelle case, the taxpayer had adopted a hybrid method of accounting which failed to meet the legal requirements. This Court found that the method used most resembled the farm-price method and reconstructed net income on the basis of that method. SoRelle had also inventoried all livestock, including the stock purchased for breeding purposes. Subsequent to the filing of his returns, he claimed a depreciation deduction on the breeding stock without removing them from the inventory. This Court said (22 T.C. at 474, 475): "In view of *25 the regulations petitioners must fail in their claim that depreciation deductions on SoRelle's breeding herd for 1946 and 1947 are allowable. * * * He never in any of his tax returns claimed depreciation deductions for his breeding herd. Obviously, therefore, he had elected not to capitalize the breeding herd and take depreciation deductions thereon but, rather, to include it in inventory and forego depreciation deductions." * * * Petitioners seek to distinguish Elsie SoRelle, supra, by the fact that the taxpayer had used a hybrid accounting system which did not clearly reflect income. Such distinction is insufficient to cause us to reach a different result here. Once having made the election to inventory purchased breeding livestock, petitioners are bound to apply the chosen method, that is not to treat the livestock as a capital asset subject to depreciation, until the Commissioner approves of such a change. Jack Frost, supra; Elsie SoRelle, supra. Petitioners contend, primarily, that sec. 29.23(1)-10 of Regulations 111 is invalid. They point out that breeding livestock is property used in trade or business [2] and is, thus, subject to an allowance for *26 depreciation as provided by section 23 of the 1939 Code. Therefore, they argue, the regulation in question is contrary to the statute and invalid. *27 The specific regulatory provision which petitioners attack has been contained in the regulations since 1934, see Regulations 86, sec. 23, art. 23(1)-10, and has never been the subject of legislative disapproval. The regulation is reasonable and in accord with good accounting practices. Elsie SoRelle, supra; followed, Jack Frost, supra. Under Regulations 111, sec. 29.22(a)-7, farmers reporting income on the accrual basis are given the option of either treating their breeding stock as "capital assets subject to depreciation" or including such stock in inventory. If the latter course is adopted, however, the taking of depreciation deductions on the breeding stock is expressly prohibited by sec. 29.23(1)-10 of the Regulations. As this Court said in Elsie SoRelle at page 474: "We think that the denial of depreciation deductions for inventoried breeding stock accords with sound accounting practices for the precise reason stated in section 29.23(1)-10, to wit, 'the corresponding reduction in their value will be reflected in the inventory.'" * * * Such disallowance is reasonable and not contrary to the statute, particularly in view of the fact that farmers are allowed *28 to deduct expenses in the year incurred, even if they are of a capital nature, Regulations 111, sec. 29.23(a)-11, and that the corresponding reductions in the value of livestock will be reflected in the inventory. Decision will be entered for the Respondent. Footnotes
1. The unit-livestock-price method provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class, purchased animals being valued at cost. Regulations 111, sec. 29.22(c)-6, as amended by T.D. 5423, 1945 C.B. 70↩, 71.
2. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(J) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1)(C). Such term also includes timber or coal with respect to which subsection (k)(1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.↩