Dante J. Casali and Mary Ann Casali v. Commissioner. Harry Werksman and Evelyn Werksman v. Commissioner.
Casali v. Commissioner
Docket Nos. 3243-64, 3244-64.
United States Tax Court
T.C. Memo 1966-139; 1966 Tax Ct. Memo LEXIS 145; 25 T.C.M. (CCH) 720; T.C.M. (RIA) 66139; June 21, 1966
James M. Carter and Joseph Swartz, for the petitioners. Gerald Backer, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the income tax of petitioners Dante J. Casali and Mary Ann Casali for the calendar year 1957 in the amount of $17,549.28 and determined a deficiency in the income tax of petitioners Harry and Evelyn Werksman in the amount of $19,182.07 for their taxable year ended January 31, 1958. The issues for decision are (1) whether amounts advanced by a corporation of which the husband petitioners were equal stockholders for use in construction *146 of a truck terminal constituted dividends to petitioners and (2) whether assessments of deficiencies, if any, are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and are found accordingly. Dante J. Casali and Mary Ann Casali, husband and wife, residing in Pittsburgh, Pennsylvania, filed their joint Federal income tax return for the calendar year 1957 with the district director of internal revenue at Pittsburgh, Pennsylvania, between April 10 and April 15, 1958. Harry and Evelyn Werksman, husband and wife residing in Pittsburgh, Pennsylvania, filed their joint Federal income tax return for their taxable year ended January 31, 1958, with the district director of internal revenue at Pittsburgh, Pennsylvania, on May 14, 1958. Dante J. Casali and Harry Werksman (hereinafter referred to as petitioners) each owned 50 percent of the capital stock of Hardan, Inc. (hereinafter referred to as Hardan), a Pennsylvania corporation. Hardan was incorporated on September 18, 1953. It was dissolved on July 21, 1959. Hardan was during its entire existence engaged in the business of leasing motor freight vehicles and equipment to Helms Express, Inc. *147 (hereinafter referred to as Helms), an interstate common carrier by truck, franchised by the Interstate Commerce Commission to operate in various areas of the Northeastern United States. Prior to May of 1960 Harry Werksman (hereinafter referred to as Harry) owned 80 percent of the stock of Helms, Dante J. Casali (hereinafter referred to as Dante) owned 10 percent of the stock of Helms and the remaining 10 percent was owned by various other employees of Helms. Sometime in May 1960 Helms became publicly owned. When Hardan was formed in 1953 Helms was having labor difficulties with the local truck drivers union in Pittsburgh, Pennsylvania. Hardan was formed to own equipment and employ personnel to operate such equipment under a contract with a labor union in New Castle, Pennsylvania. All of the equipment owned and operated by Hardan was leased to Helms. Harry and Dante were president and vice president, respectively, of Hardan. During each of the years 1954 through 1958, Harry and Dante each received salaries from Hardan of $2,500 per year. During the period 1953 through 1959, Hardan made loans to both Harry and Dante. No notes were given for these loans and no interest was charged *148 thereon. All of the loans were recorded on the books of Hardan as loans to officers and were repaid. These loans were made by Hardan to petitioners at different times and in varying amounts and were repaid at different times and in different amounts. These loans were not received by petitioners in direct proportion to their stockholdings in Hardan. In 1947 Jacob Simons (hereinafter referred to as Jacob) built a building in Pittsburgh for lease to Helms. This was the first association Dante and Harry had with Jacob. Jacob had experience in construction and general contracting work and neither Harry nor Dante had such experience. In 1956 Harry, Dante, and Jacob and their respective wives formed a general partnership under the name of Thirty Development Company (hereinafter referred to as Thirty). The wives were not active in the partnership business but were named as partners because Thirty was expected to hold title to land. Thirty existed from January 1, 1956, until after Jacob's death in 1960 and during this period built four terminals all of which were leased to Helms for its trucking operations. Jacob supervised the construction of these four terminals. Harry began to look *149 for land in Cincinnati for a terminal site in 1956 and in that year Jacob went to Cincinnati to locate such land. On May 7, 1957, Jacob executed an offer to purchase certain land in Cincinnati, Ohio, on which to build a truck terminal for lease to Helms. The downpayment on this property was made by check payable to Abe Byers in the amount of $10,000 drawn by Jacob on the account of Thirty with the William Penn Bank, Pittsburgh, Pennsylvania. A check for $10,000 payable to Thirty was drawn by Dante on the account of Hardan on May 8, 1957. This check was deposited in Thirty's account on May 10, 1957. The notation on the check stub, these stubs being used by Hardan for a general journal, was "a 60-day-loan-advance to Commercial Terminals, Inc." On August 20, 1957, title to the Cincinnati property on which Jacob made the offer was acquired jointly by Harry, Dante, and Jacob. The names of their wives were not included in the deed. A cashier's check for $40,000, payable to Land Title and Guarantee Co. to make payment on this land at the closing was purchased by a check of $40,000 drawn on Hardan's bank account on August 20, 1957. Sometime in late 1956 or early 1957 Dante, Harry, and *150 Jacob tentatively agreed that the terminal to be erected in Cincinnati was to be owned and operated by a corporation to be formed under the laws of Ohio which would be called Commercial Terminals, Inc. (hereinafter referred to as Terminals), the stock to be owned one-third by Jacob and two-thirds by Hardan. In late January 1957 counsel was instructed to form this Ohio corporation. Terminals was formed on August 23, 1957, and stock subscriptions were issued to the incorporators, nominees of Corporation Trust Company, and at a meeting of the incorporators on August 30, 1957, assigned to Dante, Harry, and Jacob. In September 1957 Jacob refused to agree to having the Cincinnati terminal built and owned by a corporation. Thereafter, Harry and Dante would talk to Jacob and he would orally agree to placing the Cincinnati terminal in a corporation but later would refuse to agree to such action when preparation was being made to place it in a corporation. On October 1, 1957, construction of the terminal began. Because of the failure to secure Jacob's cooperation in the use of a corporate entity, Harry, Dante, and Jacob continued to hold title to the Cincinnati property on which the terminal *151 was being erected in their individual names. Under date of September 12, 1957, Jacob wrote a letter addressed to the attorney for Helms and Hardan in which he stated in part: I am enclosing all the papers pertaining to the Cincinnati property. Since it is going to be Corporation, I am not going to be a partner. However, title is vested in the three partners and it will become necessary that I convey my title interest to the corporation. I have invested no money into this property to date. For the protection of Harry & Dante, I wrote a memorandum last week, signed by Selda & myself, which I gave to Harry before I left Pgh - declaring that I had made no investment and that I would sign a deed for $1.00 whenever such a deed was presented. If the corporation is already set up, such a deed is now in order. You can prepare the deed or have the Title Co. in Cincinnati prepare the deed at your choice. I feel that the $1.00 consideration is in order both for the deed and for the stamps. * * *
It was anticipated that the total cost of the Cincinnati terminal would be approximately $275,000. It was expected that a long-term mortgage of between $140,000 and $165,000 could be obtained *152 and the balance needed to construct the terminal would come from other sources. The mortgage actually obtained on March 26, 1958, was for $145,000. The original plan was that Jacob would supply one-third of the investment required above the long-term loan and Hardan the remaining two-thirds. In addition to the two checks totaling $50,000 given by Hardan in connection with the purchase of the land in Cincinnati, Ohio, Hardan in 1957, issued other checks in connection with the erection of the Cincinnati terminal on the dates for use as follows: Date
Amount
Purpose
9/23/57
$ 177.20
Title insurance
10/ 3/57
324.00
Survey of property
10/31/57
13,871.00
Payment to contrac-
tor
11/ 5/57
280.76
Cost of formation of
corporation, Com-
mercial Terminals,
Inc.
$14,652.96 In 1958 Hardan made further expenditures in connection with Terminals bringing the total expenditures made in the 2 years to $86,564.12. Jacob kept the records of Thirty which he would send each year to the accountant who prepared the return of income, Form 1065, for the partnership. In a letter addressed to the accountant on January 8, 1958, containing instructions *153 as to the preparation of the return of income, Form 1065, for Thirty for the taxable year 1957, Jacob stated in part: I gave Abe Byers owner of Cincinnati property a check for $10,000.00 on 30 Dev. Co. account - Har-Dan [Hardan] gave 30 Dev. Co. a corresponding check for 10,000 to make it good. Check and deposit slip enclosed - Please return to me. I did not show this transaction in the operating figures of 30 Dev. Co. - except for notation at top of sheet. If and when a decision is reached as to the set up for the Cincinnati terminal - said ownership will owe Har-Dan $10,000 as of May 10, 1957, and $40,000 Sept. 6th by check to Abe Byers trustee. Also payment for title examination and engineer's service and etc. which Dan will give you when you are ready to set up the books. On the return of income, Form 1065, for Thirty for the calendar year 1957 the land in Cincinnati is not shown as an asset of the partnership and no debt to Hardan is shown in the liabilities section of the balance sheet as of December 31, 1957. On the return of income, Form 1065, of Thirty for the calendar year 1958, the balance sheet as of December 31, 1958, shows the land and building in Cincinnati as *154 assets and as a liability a loan payable to Hardan in the amount of $86,564.12. This balance sheet also shows as a liability a loan payable to Jacob of $35,000. During 1958 Jacob supplied $35,000 toward the construction of the Cincinnati terminal. This return also lists the Cincinnati building in the depreciation schedule and shows a depreciation deduction claimed for 6 months of the year. The gross income reported on this 1958 return of Thirty shows income from the Cincinnati property, and the deductions shown on the return include expenses of the Cincinnati property. These items as shown on Thirty's 1958 return of income were in accordance with Jacob's authorization to Thirty's accountant. When Helms commenced paying rentals on the Cincinnati, Ohio terminal in 1958, it was necessary for some entity to report the receipt of such rentals as income. The Hardan books show on January 31, 1958, the end of its fiscal year 1958, a ledger account entitled, "Investments and Advances" with a debit balance of $64,684.96. The title of this account was taken from the Uniform System of Accounts for Common and Contract Motor Carriers of Property described by the Interstate Commerce Commission, which *155 defines investments and advances - affiliated companies as follows: (a) This account shall include the book cost * * * of the carrier's investments in securities issued or assumed by affiliated companies; notes of affiliated companies maturing later than one year from the date of issue; and the amount of advances to and receivables from affiliated companies not subject to current settlement, including accrued interest on such advances when not subject to current settlement. Exclude from this account securities held in special fun s or as temporary cash investments. * * * About the first of July 1956 Helms had included in its labor contract provision that drivers who had been "laid off" would not retain seniority rights after 2 years. Therefore, after about the middle of 1958, it was not necessary for labor reasons that an entity other than Helms employ the persons who drove the trucks over the routes serviced by Helms. For sometime prior to October 1957 Helms had been negotiating for the purchase of another freight line, Zeno. In October 1957 Helms filed an application with the Interstate Commerce Commission to acquire and operate Zeno. In February 1958 Harry learned that the Interstate *156 Commerce Commission had certain objections to a franchised carrier operating with equipment leased from a subsidiary. Helms in early 1959 was contemplating a public issue of stock. Payments by Helms of rentals to Hardan were resulting in profits to Hardan which if Helms owned and operated its own equipment would be a part of Helms' own profits. Such additional profits could improve the issue value of Helms' stock. By the beginning of 1959, Hardan's accountant was concerned with the fact that Hardan's surplus was approaching $100,000 which in his opinion created the possibility of the imposition of tax under section 531 of the Internal Revenue Code of 1954. In view of all these circumstances consideration was given in early 1959 to dissolving Hardan. When, on July 21, 1959, Hardan was dissolved, its assets were distributed to its two stockholders in kind. These assets consisted of $46,324.41 in cash and $92,057.12 in investments and advances and accounts receivable. The amount of $86,589.12 was in the "Investments and Advances" account. This entire amount represented the advances made by Hardan in connection with the Cincinnati terminal project. Hardan's assets *157 were distributed as follows: Retained
for pos-
sible lia-
Harry
Dante
bilities
Cash
$17,266.00
$22,734.00
$6,324.41
Investments and
advances
43,294.66
43,294.66
Accounts receiv-
able
5,468.00 Harry and Dante each contributed the balance in the investment and advances account distributed to him by Hardan to his capital account in Thirty. In addition in 1959 Harry and Dante each contributed the amount of $10,000 in cash to the Thirty partnership. Jacob died in February 1960. The Thirty partnership accounts were closed on March 31, 1961, upon the settlement of Jacob's estate. On the same day the Cincinnati, Ohio terminal property and a terminal in Akron, Ohio completed on October 1, 1959, were transferred to Terminals. The amounts owing to Jacob's estate representing Jacob's equity in Thirty were paid by issuing notes which were assumed by a corporation which took title to properties in Irwin, Pennsylvania, previously owned by Thirty. The notes were subsequently paid by that corporation. During the years 1953 through 1956 Harry and Dante both had endorsed notes for loans extended to Hardan in amounts ranging from $20,000 *158 to $31,000. Dante had borrowing power of $50,000 to $100,000 and Harry had borrowing credit of approximately $300,000. Hardan from its formation in 1953 to January 31, 1957, had accumulated earnings and profits of $63,573.72. Hardan's increase in earnings and profits for the fiscal year ended January 31, 1958, was $29,439.67. The joint Federal income tax return of Harry and his wife for the fiscal year ended January 31, 1958, which was timely filed on May 14, 1958, reported gross income of $65,801.06. The joint Federal income tax return of Dante and his wife for the calendar year 1957 which was due on April 15, 1958, and filed between April 10, 1958, and April 15, 1958, reported gross income of $81,015.86. Neither Harry nor Dante made any disclosures in their respective returns for these years regarding the Cincinnati terminal project. Respondent, on April 10, 1964, issued a notice of deficiency to Dante and his wife in which taxable income was increased by an amount of $32,226.48 with the explanation that it had been determined that petitioners, in the year 1957, received dividend income of $32,326.48 from Hardan, which was includable in their taxable income except to the *159 extent of the $100 dividend exclusion. In further explanation in this notice of deficiency, respondent stated that inasmuch as petitioners had omitted from gross income an amount properly includable therein, "which is in excess of 25 percent of the amount of gross income stated in the return, your return filed for the year 1957 is held open under the provisions of section 6501(e) of the Internal Revenue Code of 1954." On the same day, April 10, 1964, respondent issued a notice of deficiency to Harry and his wife for their fiscal year ended January 31, 1958, increasing their reported income by $32,326.48 with the explanation that this amount represented a dividend from Hardan, received during their taxable year ended January 31, 1958, and that their entire dividend exclusion had been applied to dividend income reported in their return. This notice of deficiency also stated that because of omission from gross income of an amount in excess of 25 percent of the amount of gross income reported in the return, the statute of limitations was open under the provisions of section 6501(e) of the Internal Revenue Code of 1954. Opinion Petitioners *160 take the position that they did not actually or constructively receive any dividend from Hardan during the year 1957 and up to January 31, 1958, the end of Harry's taxable year. They state that the determination of any deficiency is barred by the statute of limitations since respondent has failed to establish the required omission of 25 percent of gross income to make the 6-year statute of limitations under section 6501(e) applicable. Respondent recognizes that the determination of any deficiency is barred by the statute of limitations unless the 6-year period provided in section 6501(e) is applicable and that he has the burden to establish that amounts of income in excess of 25 percent of reported income are properly includable in petitioners' gross income in order to have the 6-year statute apply. Elsie SoRelle, 22 T.C. 459, 486 (1954). It is respondent's position, however, that the evidence is sufficient to establish the failure of each petitioner to report dividends from Hardan received in the taxable years here in issue in the amount of $32,326.48. The petitioners recognize that the amounts determined by respondent as dividend income exceed for each of them 25 *161 percent of their reported gross income for the year involved. The petitioners also recognize that Hardan had earnings and profits from which dividends might have been paid in excess of the amounts determined by respondent to be dividends. Therefore, the issue joined by the parties is whether the facts here show that the advances made by Hardan in 1957 for building of the Cincinnati terminal were made in such a manner that they in effect were dividends to the two stockholders of Hardan, the petitioners. As respondent points out, and petitioners agree, it has been held in numerous cases that if a corporation pays an obligation of its shareholders or makes payment for the benefit of those shareholders under circumstances which do not constitute a loan to the shareholders, the payments made are taxable to the shareholders as dividends in the year in which the payment is made even though no formal declaration of dividends is made by the corporation and the distribution is not recorded as a dividend distribution on the corporate books. American Properties, Inc., 28 T.C. 1100 (1957), affd. per curiam 262 F. 2d 150 (C.A. 9, 1958), and Louis Greenspon, 23 T.C. 138 (1954), *162 affirmed on this issue 229 F. 2d 947 (C.A. 8, 1956). The facts in both the American Properties, and Louis Greenspon cases differ substantially from the facts in the instant case. Respondent, however, contends that the principles there applied are equally applicable here since the advances made by Hardan for the building of the Cincinnati terminal were payments for the benefit of petitioners and not either loans to Thirty or investments by Hardan in its own behalf. In Louis Greenspon, supra, we held that expenses of a farm owned and operated by the taxpayer there involved, paid by a corporation, constituted income to the stockholder owner of the farm on whose behalf such expenses were paid. We further held that the cost of farm machinery and equipment purchased by the corporation with title thereto taken in the corporate name should not be included in the shareholder's income. In so holding we pointed out that we did not decide the question of whether a stockholder making use of property by a corporation should be charged with receiving income to the extent of the value of the use of such property as this question was not raised in the case. In the instant *163 case, the terminal was to be used by Helms for a rental charge, the owner of the terminal to receive the rental payment. Therefore under our holding in Louis Greenspon, supra, it would follow in the instant case that if the advances made by Hardan for building the Cincinnati terminal were not loans but were investments for the purpose of enabling petitioners to acquire either ownership of the terminal or stock in a corporation which would own the terminal, the payments would constitute dividends to petitioners, but if the payments were for the purpose of investments by Hardan in Terminals, the stock of which would be acquired by Hardan and Terminals was to be the owner of the terminal building, the payments would not constitute dividends to petitioners in 1957. The fact that the situation might have changed in the year 1958 when Thirty, a partnership in which petitioners were two of the partners, began to operate the terminal, receive the rental income therefrom, and claim the expenses incurred in the operation as deductions in its partnership return of income is not determinative of the taxability to petitioners in 1957 of the advances made by Hardan. Neither is the treatment *164 of the advances upon liquidation of Hardan in 1959 determinative of the nature of the advances in 1957. Those subsequent facts have relevancy only insofar as they might be indicative of the intent with which Hardan made the advances in 1957. We consider the question here to be entirely factual and recognize that since the burden is on respondent, any deficiencies in the facts will result in a failure of proof by respondent and not by petitioners. The facts here show that when it was decided to build a terminal in Cincinnati, Ohio, for the use of Helms, with rental to be paid by Helms, petitioners and Jacob tentatively agreed to have formed a corporation which would build, own, and operate the terminal. It was the intention that Jacob would own one-third of the stock of this corporation and that Hardan would own the other two-thirds. Respondent points to the fact that title to the land was taken in the names of petitioners and Jacob and the fact that the right of subscription to stock of Terminals was assigned to these three persons by the incorporators as indications that it was not the intent of the parties that Hardan own two-thirds of the stock of Terminals. The testimony of *165 each of petitioners is directly to the contrary. The testimony of the accountant who prepared the income tax returns of Thirty and Hardan that in early 1959, when it had been concluded that some resolution as to the ownership of the Cincinnati terminal property should be arrived at before the 1958 return of income of Thirty was filed, discussions were had of forming a partnership between Hardan and Jacob to own and operate the Cincinnati terminal also indicates that the intention of the parties was for Hardan to be a two-thirds owner of the Cincinnati terminal property. The title to the land was taken prior to the formation of the corporation and logically was best taken in the names of petitioners and Jacob to facilitate its transfer to the corporation. Likewise, the assignment of stock subscription rights to Hardan could be made by these individuals at any time they deemed appropriate. No stock in Terminals was issued, nor was the corporation activated until well after the close of the taxable years here involved. Respondent requested a finding that "Simon [Jacob] was to acquire one-third of the shares of Terminals. With respect to the remaining two-thirds of the shares, it was *166 undecided whether Hardan would own two-thirds of the shares or Werksman and Casali one-third each." After considering all the evidence, we did not make this finding but rather found that it was the original intent that Hardan own two-thirds of the shares of Terminals and Jacob one-third. We believe petitioners' uncontradicted testimony that it was intended that Hardan acquire two-thirds of the stock of Terminals. The testimony is corroborated by the fact that one of the checks drawn by Hardan was to pay the costs of incorporating Terminals. Jacob's letter of January 8, 1958, makes reference to no decision having been reached as to the set-up for the Cincinnati terminal but that "said ownership" will owe Hardan certain sums. However, even if we had accepted respondent's requested finding that it was undecided as of the end of 1957, and insofar as the record shows, January 31, 1958, as to who would own the two-thirds of the stock of Terminals not owned by Jacob, it would not follow that Hardan had made a payment in the year 1957 for the benefit of petitioners as distinguished from an investment to acquire assets in its own name in the form of the stock of Terminals. The record shows *167 that as of the end of 1957 there still existed disagreement as to whether Terminals would own the Cincinnati terminal property or the property would be placed in some form of partnership. There is no showing of any change in this situation prior to January 31, 1958. This fact supports respondent's contention that as of the end of 1957 there existed no definite loan of funds by Hardan to Thirty and that a loan, if any, by Hardan to Thirty did not come into existence until 1958 or possibly after the close of the calendar year 1958 when decision was being made as to how to file the return of income of Thirty and how to report the rental payments being made by Helms. However, we do not agree with respondent's further contention that the conclusion to be drawn from this fact is that petitioners received a dividend from Hardan in 1957. We conclude from the fact that it was not decided until after the end of the year 1957 that the ownership of the Cincinnati building would not be in a corporate entity, in which Hardan would be a two-thirds stockholder, that respondent has failed to show that during the year 1957 any amount was paid by Hardan for an obligation of or the benefit of its shareholders *168 as distinguished from an investment of its own funds. As respondent points out, the new corporation would only be able to repay Hardan to the extent that a long-term mortgage placed on the property was in an amount greater than would be needed to finish construction of the building and any further repayment of advances would have to await receipt of income in the way of rentals from Helms which rental receipts would first be used to satisfy the long-term mortgage payments, interest thereon, and operating expenses of the terminal. We agree with respondent that the date when any repayment might be expected by Hardan from Terminals other than a small amount from a portion of the long-term mortgage would be so uncertain as to make the advances over and above the amount which would be repaid by a portion on the long-term mortgage more in the nature of preferred stock than loans. Nevertheless, this does not mitigate against the fact that as of the end of the taxable years here involved the investment was still to be in a corporation in which Hardan would be a two-thirds stockholder. Respondent relies primarily on Elliott J. Roschuni, 29 T.C. 1193 (1958), aff. 271 F. 2d 267, *169 certiorari denied 362 U.S. 988. In that case many of the factors pertinent to a determination of whether amounts paid by a corporation for the benefit of its stockholder are loans or dividends are set forth. In that case we concluded after consideration of all the facts that the payments were dividends to the stockholder. That case is not controlling in the instant case since in the instant case the evidence fails to show that in 1957 or up to January 31, 1958, the corporation, Hardan, made any payments for the benefit of its stockholders, petitioners. We have concluded that respondent has failed to establish that the advances by Hardan in 1957 were to pay an obligation of or for the benefit of petitioners so as to be considered as dividends to them from Hardan. Since, absent respondent's establishing this fact, there is no showing that petitioners omitted from their gross income an amount in excess of 25 percent thereof so that the 6-year statute of limitations provided by section 6501(e) applies, any deficiencies determined against petitioners are barred by the statute of limitations. Decisions will be entered for petitioners.