Oswald Jacoby, et al. [1] v. Commissioner. Jacoby v. Commissioner
Docket Nos. 574-68 - 576-68, 935-69 - 937-69.
United States Tax Court
T.C. Memo 1970-244; 1970 Tax Ct. Memo LEXIS 115; 29 T.C.M. (CCH) 1068; T.C.M. (RIA) 70244; August 27, 1970, Filed Jack W. Hawkins, 1700 Republic Nat'l Bankbldg., Dallas, Tex., for the petitioners. D. Ronald Morello, for the respondent. FEATHERSTON
Memorandum Findings of *116 Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax under sections 6653(a), [2]6653(b), and 6654 as follows: Dkt. No.
Year
Amounts
Additions to Tax
Sec. 6653(a)
Sec. 6653(b)
Sec. 6654
574-68
1961
$ 9,260.29
$ 4,630.15
$252.16
1962
21,706.56
10,853.28
601.47
575-68
1961
$ 9,044.29
$ 4,522.15
$ 252.16
1962
21,480.97
10,740.49
601.47
576-68
1960
20,518.95
10,306.90
1963
15,179.65
7,589.83
935-69
1965
30,142.68
15,071.34
936-69
1964
14,471.53
7,235.77
937-69
1965
29,966.89
$1,498.34 In amendments to the answers, respondent asserted further additions to tax under sections 6651 and 6653(a) as follows: Dkt. No.
Year
Additions to Tax
Sec. 6651
Sec. 6653(a)
574-68
1961
$2,315.07
$ 463.01
1962
5,426.64
1,085.32
575-68
1961
2,261.07
452.21
1962
5,370.24
1,074.05
576-68
1960
5,153.45
1,025.95
1963
758.98
935-69
1965
1,507.13
936-69
1964
723.58
Both parties *117 have made concessions and the issues remaining for decision are as follows: (1) What was the amount of petitioners' unreported income from wagering, if any, during 1960 through 1965; (2) Whether petitioners are entitled to deductions for gambling losses sustained in the years in question, and, if so, in what amounts; and (3) Whether any part of the underpayments for 1964 and 1965 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Findings of Fact Oswald Jacoby (hereinafter referred to as petitioner) and Mary Zita Jacoby (hereinafter Mary), husband and wife, were legal residents of Dallas, Texas, at the time they filed their petitions. They filed joint income tax returns for 1960, 1963, and 1964 and separate income tax returns for 1965 with the district director of internal revenue at Dallas. For 1961 and 1962 petitioners did not file income tax returns. Petitioner is a professional bridge authority and in three of the years in question accumulated in tournament bridge more master points in each year than any other contestant. He writes a syndicated column on bridge which appears in about 400 newspapers and is the *118 author of numerous books on card games and mathematics. Occasionally, he also performs actuarial work and gives lectures on bridge. All of these activities produced income during 1960 through 1965. During the years in controversy, petitioner gambled extensively at poker, blackjack, gin rummy, backgammon, an American version of baccarat, dice, rubber bridge (but not tournament bridge), and wagered on athletic events. He gambled at casinos in Las Vegas, Nevada, and in the Bahamas; at various clubs in New York City, in Dallas and Fort Worth, Texas, and in Phoenix, Arizona; and at the homes of friends and acquaintances. Petitioner usually carried $100 to $400 in cash on his person. When he won at gambling, it was his practice to deposit his gains in one of his bank accounts. On some occasions, however, he used his winnings for gambling stakes for the next day, continuing this process until the excess was either lost or deposited. When petitioner lost in a card game he almost always paid the winner in cash if he had sufficient funds with him. If not, he often gave the winner a check. Although some of the individuals with whom he played cards were willing to accept checks payable to *119 cash, most of them would not accept checks payable to themselves. Accordingly, petitioner often gave them checks payable to cash. He also frequently drew checks payable to the club where he was playing, obtained the cash, and then used it to pay the winners. Petitioner kept no records of how much he won or lost in gambling other than his bank records. Petitioners maintained a modest standard of living at home - they did not entertain extensively, and did not own a yacht, hunting lodge, or other similar recreational facility. Their home in Dallas was held subject to a mortgage on which they made monthly payments of about $139 per month. They took no trips unrelated to bridge tournaments or gambling, execpt a 10-day visit to Colorado and Wyoming in 1963. Mary did her own house and yard work, receiving only occasional assistance from hired employees. 1070 Bank Deposits and Expenditures In determining the deficiencies here in dispute, respondent used the bank deposits and cash expenditures methods of income reconstruction, adjusting the total amount of the bank deposits for loans, transfers between accounts, redeposits, and other nontaxable items, as well as non-gambling income *120 deposits which were otherwise included in petitioners' taxable income. The following table summarizes respondent's determinations - column (1) includes as gambling receipts all deposits in petitioners' bank accounts which were not identified as nontaxable items or included in taxable income in some other way; column (2) refers to royalties, fees, and other non-gambling income (as reflected primarily in the records of the payors) not otherwise included in taxable income; column (3) summarizes cash payments made by petitioners from unidentified sources; column (4) represents an estimate of petitioners' living costs (incurred mainly during the periods when they were not traveling away from home in the pursuit of their business endeavors); and column (5) reflects the totals of the four other columns: UNREPORTED
INCOME AS
DETERMINED BY
RESPONDENT
(1)
(2)
Taxable Year Ending
Taxpayers
Gambling
Royalties, Fees &Other
Deposits
Non-gambling Income
1960
Oswald and Mary
$40,866.33
$1,400.00
1961
Oswald
13,120.46
[3] 8,136.05
Mary
13,120.46
[3] 8,136.05
1962
Oswald
38,307.41
[3] 5,544.32
Mary
38,307.41
[3] 5,544.32
1963
Oswald and Mary
[2] 30,273.60
417.59
1964
Oswald and Mary
32,954.95
1965
Oswald
2,199.25
Mary
2,199.25
*121 UNREPORTED
INCOME AS
DETERMINED BY
RESPONDENT
(3)
(4)
(5)
Taxable Year Ending
Cash Payments-
Living Costs
Total
Unidentified
Unreported Income
Sources [1]
1960
$7,995.86
$2,000.00
$52,262.19
1961
2,704.85
1,000.00
24,961.36
2,704.85
1,000.00
24,961.36
1962
878.45
1,000.00
45,730.18
878.46
1,000.00
45,730.19
1963
6,934.78
2,000.00
39,625.97
1964
2,170.00
35,124.95
1965
2,199.25
2,199.25
Respondent made certain errors in the determinations reflected in the foregoing table. He erred in including in "Gambling Deposits" (column 1) the following amounts: Taxable
Taxpayer
Amount
YearEnding
1960
Oswald and Mary
$1,089.56
1961
Oswald
418.83
Mary
418.83
1962
Oswald
438.13
Mary
438.13
1963
Oswald and Mary
1,214.91
1964
Oswald and Mary
8,518.64
*122 These amounts for 1960, 1961, 1962, and 1963 were otherwise included in petitioners' income as royalties; the amount shown for 1964 represents nontaxable medical insurance payments, received by petitioner in connection with injuries which he suffered in an automobile accident in that year, in the sum of $1,518.64, and loans totaling $7,000. Respondent also erred in including in "Cash Payments-Unidentified Sources" (column 3) the amounts of $1,983.50 for 1960 and $2,170 for 1964; these amounts were paid in those years from moneys which Mary had accumulated prior to January 1, 1960. In addition, respondent erroneously included in "Cash Payments- Unidentitied Unidentified Sources" (column 3) the following amounts which were paid with checks received as royalties, fees, and other non-gambling income and which were included in petitioners' taxable income in other ways: Taxable
Taxpayer
Amount
YearEnding
1960
Oswald and Mary
$5,960.84
1961
Oswald
2,614.29
Mary
2,614.29
1962
Oswald
878.45
Mary
878.45
1963
Oswald and Mary
6,934.78
Petitioners' unreported income from gambling (gambling deposits as adjusted, column (1); cash payments-unidentified *123 source as adjusted, column (3); plus living costs, column (4)) during 1960 through 1965 was as follows: Taxable
Taxpayer
Unreported
YearEnding
GamblingIncome
1960
Oswald and Mary
$41,828.29
1961
Oswald
13,792.19
Mary
13,792.19
1962
Oswald
38,869.28
Mary
38,869.28
1963
Oswald and Mary
31,058.69
1964
Oswald and Mary
24,436.31
1965
Oswald
* 2,199.25
Mary
* 2,199.25
Gambling losses Petitioner suffered substantial losses in his gambling activities during 1960 through 1965. Some of these losses were paid by checks which petitioner identified by the payee, endorser, or the date and place where issued. The total amounts of checks given in connection with gambling losses are as follows: Taxable Year Ending
Amount
1960
$20,804.00
1961
27,020.00
1962
60,983.50
1963
13,861.00
1964
12,933.74
1965
92,770.30
During 1960 through 1964, petitioner *124 procured loans in the following amounts and the proceeds were used to pay gambling losses: Date
Lender
Amount
Where Deposited
3-22-60
Albert or Loy Morehead
$ 500
National Bank of Commerce (Dallas)
3-31-60
H. H. Strauss
1,000
National Bank of Commerce (Dallas)
4- 8-60
W. W. McGhee
1,500
National Bank of Commerce (Dallas)
6-10-60
Robert McFarlane
750
National Bank of Commerce (Dallas)
6-27-60
George E. Roosevelt
2,500
National Bank of Commerce (Dallas)
12-16-60
Albert or Loy Morehead
1,000
National Bank of Commerce (Dallas)
1-31-61
Oak Cliff Bank & Trust Co.
2,500
Oak Cliff Bank & Trust
2-21-61
Valley National Bank
5,000
Valley National Bank (Arizona)
5-15-61
Albert or Loy Morehead
1,500
Valley National Bank (Arizona)
8-17-61
Robert McFarlane
500
Oak Cliff Bank & Trust
8-21-61
Albert or Loy Morehead
1,000
Oak Cliff Bank & Trust
8-28-61
Albert or Loy Morehead
1,000
Oak Cliff Bank & Trust
10- 6-61
W. W. McGhee
1,500
Oak Cliff Bank & Trust
1962
Robert McFarlane
1,500
Not deposited
5-11-62
J. G. Ripstra
1,000
National Bank of Commerce (Dallas)
7- 9-62
Albert or Loy Morehead
500
National Bank of Commerce (Dallas)
7-11-62
Sol Brachman
12,000
National Bank of Commerce (Dallas)
11-15-62
Albert or Loy Morehead
1,000
Morgan Guaranty Trust Co.
12-23-62
Theodore S. Faller
1,000
Not deposited
2-11-63
Albert or Loy Morehead
400
National Bank of Commerce (Dallas)
2-11-63
Albert or Loy Morehead
600
Oak Cliff Bank & Trust
3- 8-63
Leo Friedman
4,800
Morgan Guaranty Trust Co.
3-11-63
Lester Bachner
800
Oak Cliff Bank & Trust
9-10-63
Paul Levitt
300
Not deposited
11-13-63
Lester Bachner
500
Morgan Guaranty Trust Co.
5-25-64
Real Properties, Inc.
6,000
Oak Cliff Bank & Trust
7-18-64
Theodore S. Faller
1,000
Oak Cliff Bank & Trust
12-23-64
Theodore S. Faller
1,000
Not deposited
*125 As indicated, however, the proceeds of all these loans, except the loans of $1,500 from Robert McFarlane in 1962, $1,000 from Theodore S. Faller in 1962, $300 from Paul Levitt in 1963, and $1,000 from Theodore S. Faller in 1964 were deposited in petitioners' bank accounts, were so identified, and were not included in unreported income as determined by respondent; checks drawn on these deposits to pay gambling losses are included in the computations of gambling losses paid by check set forth above. In 1960 petitioner surrendered his life insurance and received $466.60 which he 1072 used to pay gambling losses. He also liquidated some of his stock investments, receiving $1,387.78 and $8,655.03 in 1961 and 1965, respectively, which he used to pay gambling debts without first depositing the proceeds. Petitioners sustained gambling losses during 1960 through 1965 in the following amounts: Taxable Year Ending
Amount
1960
$ 21,000
1961
26,500
1962
63,500
1963
14,000
1964
14,000
1965
101,500
Opinion In determining the deficiencies here in dispute, respondent employed a version of the bank deposits and cash expenditures method of income reconstruction. *126 The parties are in general agreement that respondent's determinations, as adjusted, are correct with respect to the income and expenditures from all activities except gambling. Respondent included in gambling income all deposits not identified as having come from other sources, all cash payments from unidentified sources, and an estimated amount for family living expenses, and allowed no deductions whatever for gambling losses. Petitioner claims that the determined gambling income is excessive, and that he suffered gambling losses at least equal to his winnings in each of the years 1960 through 1964. He also contends that he realized no greater net income from gambling than the amount reported in his return for 1965. Before analyzing the evidence on gambling gains and losses, we must dispose of petitioners' objections to respondent's use of the bank deposits and cash expenditures method of reconstructing his income. As background for evaluating petitioners' arguments, we note that section 6001 and the regulations issued pursuant thereto require a taxpayer to keep such books of account or records as are sufficient to establish the amounts of the gross income, deductions, and other *127 matters shown in his tax return. Sec. 1.6001-1(a), Income Tax Regs. If a taxpayer does not keep books or records, or if his records are inaccurate or incomplete, the Commissioner may resort to other, less direct, means of ascertaining income. Sec. 446; Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. In the present case petitioner maintained no records on his extensive gambling activities other than his bank statements and canceled checks, and some of them had been lost; consequently, respondent was fully justified in employing the bank deposits and cash expenditures method, one of the standard techniques of indirect income reconstruction. Petitioners do not seriously contend otherwise, but assert that respondent has so used these methods as to produce an absurd and completely unrealistic result. Petitioners point out that respondent failed to make any adjustments for gambling losses and argue that this renders respondent's reconstruction arbitrary as a matter of law. We disagree. Where a taxpayer is shown to have an income source, the Commissioner may properly treat unidentified deposits *128 as income, and the burden is on the taxpayer to establish what amounts, if any, are not attributable to items of income and what deductions, if any, are allowable. See Thomas B. Jones, 29 T.C. 601, 614 (1957). Such treatment is not arbitrary unless it is shown to reflect excessive amounts of income. And there "is no arbitrariness simply because the Commissioner erred in some of his choices as to what constituted income" or in his denial of deductions against income. See Marcello v. Commissioner, 380 F. 2d 509, 511 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court. Petitioners' second argument - that respondent is required to establish the total amount of a taxpayer's cash and other resources on hand at the beginning of the tax years as a condition to use of the bank deposits and cash and expenditures method - is also faulty. This argument was rejected in Price v. United States 335 F. 2d 671, 677 (C.A. 5, 1964), in these terms: * * * the "bank deposits" method assumes only that all money deposited in a taxpayer's bank account during a given period constitutes taxable income. Similarly, the "cash expenditures" method assumes that *129 cash expended by the taxpayer, which was not disbursed from his bank account, came into the taxpayer's possession as taxable income. It is the burden of the taxpayer to demonstrate a non-taxable source for this cash. 1073 As can be seen readily, neither the "bank deposits" nor the "cash expenditures" method necessitates a determination of the total net worth of the taxpayer at any time. Of course, a beginning bank balance must be established and deducted for the first year if the "bank deposits" method is employed, and the Government must take into account any non-taxable source or deductible expense of which it has knowledge. * * * If taxpayer felt that the Government's method of computation was unfair or inaccurate, the burden was on him to show such unfairness or inaccuracy. The following further observation of the court (335 F. 2d at 677) is instructive in applying such cases as Dupree v. United States, 218 F. 2d 781 (C.A. 5, 1955), and Marcus v. United States, 422 F. 2d 752 (C.A. 5, 1970), on which petitioner relies: Since this is a civil action by the Government to recover a deficiency, the cases involving criminal prosecutions *130 for tax evasion are not apposite because of the greater burden of proof imposed upon the Government in that class of cases. We hold that the burden of proof rested with petitioner to show that respondent's determinations were erroneous. In determining the amount of petitioner's gambling receipts, respondent aggregated all deposits which were not identified as having been derived from known sources. Petitioners have shown that this computation was erroneous in that it included deposits of certain royalties otherwise included in taxable income, nontaxable medical insurance receipts, and loan proceeds. Our Findings reflect adjustments for these errors. Respondent also determined that petitioners had additional taxable income based upon the amounts of their cash expenditures which were made from unidentified sources. The validity of such a determination depends on the absence of nontaxable or already taxed funds from which the payments were made. As set forth in our Findings, the amounts of royalties, fees, and other non-gambling income received, which were included in income on the basis of the payor's records, exceeds the amounts of deposits from these sources. This constitutes a *131 source of money from which certain cash expenditures were made. Therefore, the taxable income from gambling has been adjusted to take these undeposited funds into account. Taxable income has also been adjusted to reflect purchases made by Mary with money which she had accumulated prior to January 1, 1960. Subject to these adjustments, we have sustained respondent's determinations of the amounts of petitioner's gambling income. We now reach the issue which is the center of the controversy between the parties: Whether petitioner has substantiated his claimed gambling losses. Here, again, the burden rests with petitioners. And it is not an easy burden. As substantiation, petitioner relies upon canceled checks drawn on his bank accounts during 1960 and 1965 and testimony relative thereto, statements by witnesses that they frequently observed him losing at games of chance, and other corroborating evidence. In evaluating this evidence, the single most important consideration is the credibility of the witnesses, and we are satisfied as to their truthfulness. We are convinced from the testimony that petitioner gambled frequently, compulsively, and unwisely. [3]
*132 The manner in which petitioner lived tends to substantiate the testimony that he sustained gambling losses. Although he did not present a formal net worth statement for each year, cf. Plisco v. United States, 306 F. 2d 784, 787 (C.A.D.C., 1962), certiorari denied 371 U.S. 948 (1963), he showed that he accumulated debts and liquidated life insurance and other family investments in order to raise money to feed his passion for gambling. The record depicts a modest standard of living - the enjoyment of few of the luxuries which would normally flow from such achievements as petitioner's writings, his individual genius, and his gross gambling receipts. To help substantiate his losses, petitioner introduced no less than 550 canceled checks which were given to pay such losses; as to each check, almost without exception, he identified the payee, the endorser, or, where the endorser's name was illegible or otherwise unidentifiable, the circumstances in which the check was given. In addition, he showed the amounts of the proceeds of other specific items, including insurance and 1074 stocks, which were used to cover gambling losses. We would be clearly wrong *133 if we did not hold that petitioner suffered substantial gambling losses. Despite the great volume of evidence presented, petitioner did not establish precisely the amounts of his losses. No doubt part of the proceeds of some of the checks made payable to the clubs in which he gambled, identified as having been given to pay losses, was retained and used for other purposes. Furthermore, he made certain errors in the identification of his checks; some of the checks were drawn for the repayment of loans made to petitioner in prior years, albeit to meet gambling losses, and other losses shown to have been incurred were not evidenced by checks. To assist in establishing the amounts of his losses, petitioner lays heavy emphasis on the evidence showing that he borrowed large sums of money to pay his gambling debts. However, an analysis of petitioner's bank records shows that all of the borrowed sums were deposited in his accounts, except the following: $1,500 from Robert McFarlane in 1962; $1,000 from Theodore S. Faller in 1962; $300 from Paul Levitt in 1963; and $1,000 from Theodore S. Faller in 1964. The proceeds of these four loans were used to pay gambling losses and are not otherwise *134 reflected in the loss payments. The same is not true, however, as to the deposited loan proceeds. Although petitioner used such proceeds in gambling activities, he did so by drawing checks, and those checks are included among the others discussed above. In other words no separate loss, over and above the checks drawn on the accounts in which the borrowed funds were deposited and the amount of the four undeposited loans mentioned above, is allowable in respect of the loans. Considering the record as a whole and bearing heavily on petitioners for their failure to maintain complete records, we have found that petitioner suffered gambling losses in the amounts set forth in our Findings. See Herman Drews, 25 T.C. 1354 (1956). These sums, being less than the determined gains from gambling (as adjusted in our Findings), are deductible. Sec. 165(d). [4]
The cases relied upon by respondent to support the disallowance of all losses are inapposite. In Donovan v. Commissioner, 359 F. 2d 64 (C.A. 1, 1966), *135 affirming per curiam a Memorandum Opinion of this Court, the taxpayer's bank account declined but he was unable to point to any records or a single check which was used for gambling purposes; similarly, in Hixon v. Commissioner, 253 F. 2d 459 (C.A. 2, 1958), affirming a Memorandum Opinion of this Court, the taxpayer could not distinguish between checks claimed to represent payment of gambling losses and checks given to cover living expenses. In both Stein v. Commissioner, 322 F. 2d 78 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court, and Plisco v. United States, supra, a refusal by the trial court to allow any losses as deductions was upheld but in factual situations in sharp contrast to the facts in this case; in each of those cases the taxpayer's testimony was found to be unreliable, and the court pointed out that the verity and trustworthiness of their accounting records could rise no higher than the credibility of the individuals who kept them. Here, by contrast, the documentary evidence adds weight to the credible testimony that losses were realized. The last issue is whether petitioner is liable for the negligence penalty for *136 1964 and 1965. To avoid the additions to tax under section 6653(a), [5] petitioner must show that no part of any underpayment of income taxes was due to his negligence or intentional disregard of respondent's rules and regulations in making out his tax return. Marcello v. Commissioner, 380 F. 2d 499, 505-507 (C.A. 5, 1967), affirming on this issue a Memorandum Opinion of this Court, certiorari denied 389 U.S. 1044 (1968). He maintains that there was no underpayment in 1964 and as to 1965 elicits from 1075 Haywood Lumber & Min. Co. v. Commissioner, 178 F. 2d 769 (C.A. 2, 1950), modifying 12 T.C. 735 (1949), and Miller v. United States, 211 F.Supp. 758 (D. Wyo. 1962), the proposition that, as a matter of law, a taxpayer cannot be held liable for negligence if he relies upon professional advice for the preparation of his tax return - which petitioner did in that year. Petitioner reads these cases too broadly. In each of them the tax adviser had failed to file any return at all; thus, they do not speak to the situation in which a tax adviser prepares a return on the basis of information supplied by the taxpayer, but it *137 is nonetheless inaccurate. Petitioner kept no records as to his gambling income other than certain bank records which are inadequate, standing alone, to establish his tax liability. And the rule is well settled that "the failure to maintain * * * adequate records of gambling winnings is a basis for assessing the negligence penalty." Marcello v. Commissioner, 380 F. 2d 509, 511 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court. Petitioner does not avoid these consequences of filing an inaccurate return by delegating the responsibility for its preparation to a certified public accountant who is to prepare it on the basis of information which petitioner himself has supplied. Elsie SoRelle, 22 T.C. 459, 489 (1954). *138 Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: Mary Zita Jacoby, docket No. 575-68; Oswald Jacoby and Mary Zita Jacoby, docket No. 576-68; Oswald Jacoby, docket No. 935-69; Oswald Jacoby and Mary Zita Jacoby, docket No. 936-69; and Mary Zita Jacoby, docket No. 937-69.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. For 1961 and 1962, petitioners filed no income tax returns.↩
2. This includes a specific amount of $7,300 won from Gino Scalmandre which was not disclosed by the bank deposits. ↩
1. The parties have stipulated that petitioner made payments of $3,829.86, $3,633.50, $1,756.91, $4,984.78, and $2,170 in 1960 through 1964, respectively. ↩
*. For 1965 Oswald and Mary reported in their separate returns Oswald's total "Net wagering receipts" of $42,215.09, which is the difference between conceded gross winnings of $142,683.42 and claimed losses of $100,468.33; each reported one-half of the net receipts.↩
3. In the words of Mary Zita Jacoby: Well, Mr. Jacoby is a compulsive gambler. He has written various books on different forms of gambling, and if he would only follow what he writes in his books he would be as winning a player in anything he performs in, as he is in bridge tournaments, but he does not follow his works, or his writings that he presents to the public, because of his love for - he is a compulsive gambler; like an alcoholic who drinks, he cant't control himself.↩
4. SEC. 165. LOSSES. * * * (d) Wagering Losses. - Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions.↩
5. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩